**Albert THOMAS, Plaintiff,**

v.

**Lansome NEWSOME,
Warden, Defendant.**

**Civ. A. No. 84–21–ATH (WDO).**

United States District Court,
M.D. Georgia,
Athens Division.

Oct. 31, 1986.

Floyd M. Buford, Macon, Ga., for plaintiff.

Paula K. Smith, Atlanta, Ga., for defendant.

OWENS, Chief Judge:

On February 16, 1984, petitioner Albert Thomas, proceeding *pro se*, filed this 28 U.S.C. § 2254 habeas petition attacking his convictions in the Superior Court of Clarke County, Georgia, for armed robbery and kidnapping and also attacking the two consecutive life sentences that he received for committing these offenses. In response to his motion, Floyd M. Buford, Esq., of Macon, Georgia was appointed to represent him.

Appointed counsel, with the able assistance of Ms. Nancy Grace, a recent law school graduate and a newly admitted attorney, prepared an excellent brief in support of petitioner's contentions. Petitioner twice moved to amend and moved for an evidentiary hearing. On September 29, 1986, the hearing requested by petitioner was held. Argument and further briefs having been heard and received, petitioner's claims are ready for decision.

Petitioner was convicted on May 12, 1977, in the Superior Court of Clarke County of kidnapping and armed robbery. He was sentenced to death for the kidnapping offense and was given a life sentence for the armed robbery offense. Upon appeal, the Supreme Court of Georgia vacated petitioner's death sentence, because of the decision in *Coker v. Georgia,* 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977), which held that the death penalty was unconstitutional in cases that the victim did not die as a result of the crime, and then transferred his appeal to the Georgia Court of Appeals. That court then affirmed petitioner's convictions, his sentence of life for armed robbery, and, pursuant to the Supreme Court of Georgia's decision, remanded petitioner's case to the trial court for his resentencing on the kidnapping count. *Thomas v. State,* 145 Ga.App. 69, 243 S.E.2d 250 (1978). Upon resentencing, petitioner received a consecutive life sentence, which upon appeal was affirmed. *Thomas v. State,* 150 Ga.App. 341, 258 S.E.2d 28 (1979). Throughout his trial and appeals, petitioner was represented first by court appointed counsel and later by family retained counsel.

■ Proceeding *pro se,* petitioner next filed a state habeas petition in the Superior Court of Tatnall County. After a hearing, that petition was denied. Petitioner asserted eight grounds for habeas relief in his original petition, and, by amendment, asserted four additional grounds. The state habeas judge refused to allow or consider the amendment, and further, denied relief as to all grounds in the original petition. Since the state habeas court was fairly presented with the original eight grounds for relief and with the additional four claims proposed by amendment, petitioner can assert all of them in this court. He has exhausted state remedies as to each of them, even if the state habeas court did not actually consider or discuss each of them. It could have, but it refused to do so. *Smith v. Digmon,* 434 U.S. 332, 98 S.Ct. 597, 54 L.Ed.2d 582 (1978).

The undersigned trial judge, in addition to presiding over petitioner's evidentiary hearing, has read every page of the transcript of petitioner's trial, read the briefs of counsel, examined appointed counsel's office file, and examined and considered everything otherwise submitted.

Petitioner and counsel assert as their main basis for petitioner's prayer for habeas relief an ineffective assistance of counsel claim. They assert that this claim is evidenced by the fact that petitioner's Fourth Amendment rights were not properly asserted by his counsel at trial. Petitioner and counsel do not, and could not, assert petitioner's Fourth Amendment claims in this habeas petition, however, since the State of Georgia has provided petitioner with a full and fair opportunity to litigate those claims. *See Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). Petitioner and counsel also contend that the other grounds raised in his state habeas proceeding, among which is petitioner's contention that the evidence is constitutionally insufficient to support his convictions, warrant habeas corpus relief from this court.

The evidence presented to the jury, viewed in the light most favorable to the prosecution, *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) shows that on the evening of January 28, 1977, petitioner Albert Thomas, a black male, and his fellow employee, James Robert Sims, were at the Brooklyn Inn in Athens, Georgia (T. 178–180). Petitioner Thomas wanted to borrow some cassette tapes from Sims. When they went to Sims' car, petitioner saw Sims' .38 calibre pistol. (T. 181). Petitioner asked to see the pistol, and Sims gave it to him. (T. 184). As a friend asked Sims for a ride, Sims turned away. (T. 184). When Sims turned back around, petitioner had left without returning the pistol. *Id.* Sims later found petitioner and asked him to return the pistol, but petitioner refused to do so. (T. 186–187). Sims testified that the pistol had contained three bullets when he gave it to Thomas. (T. 182).

The victim, David Parris, the night auditor of the Days Inn on Highway 78 in Athens, Georgia, went to work as usual on January 28th at 11:00 p.m. (T. 220–223). At approximately 2:00 to 2:30 a.m., January 29th, petitioner entered the motel office and pulled out the .38 calibre pistol. (T. 223–224, 226, 262–263). Parris told him, "You can have anything you want. I will give you no trouble." (T. 227). While petitioner was in the office, Jack Jones came into the motel and tried to rent a room for his band. Petitioner made Parris get rid of Jack Jones. (T. 199–201, 227–228, 232). John Cheek, who was outside in a vehicle waiting for Mr. Jones, noticed a blue Pinto auto parked near the motel office. (T. 207, 212). Neither Jack Jones nor John Cheek could identify petitioner as the black male seen in the motel office.

Petitioner took the money out of the cash register and gasoline drawer. Parris estimated that the amount taken was $300.00. (T. 229, 231–232). They then went to the car petitioner was driving, a blue Pinto, and Parris got in on the passenger side. (T. 237–238). Petitioner made Parris take off his shoes and all of his clothes. He then took Parris' change, car keys, house key, and wallet, and tied Parris up with his clothing. (T. 239–240). Petitioner then drove to a deserted area and made Parris get out of the car. (T. 246–247). When a truck pulled up behind him, petitioner made Parris get back in the car and continued to ride around. (T. 247–248).

While driving around and for no apparent reason, petitioner shot Parris in the head. (T. 249–250). The bullet entered the front of his head and exited at the rear. It blinded Parris in one eye and caused brain damage to the frontal lobes. T. 225, 652, 727, 731).

Petitioner stopped the car again. Parris had begun to lose consciousness. (T. 254). Petitioner forced Parris to get out of the car. Parris testified that he seemed to fall into a culvert, and after he was out of the car, petitioner shot him again, this time in the chest. (T. 254, 654). Parris was left shot in the head and chest, dressed only in his socks, and the temperature was between 14–19 degrees Fahrenheit. (T. 256, 308) The gunshot wound necessitated the removal of Parris' spleen and a colostomy. (T. 261, 656–657).

After petitioner left, Parris managed to pull on his pants and crawl up on the road. (T. 255–256, 312). Ms. Frances Cofer, who had a paper route, was driving on the road at approximately 3:00 a.m. when she saw Parris. (T. 305–307). He was covered with so much blood that Ms. Cofer thought he had on a pink shirt. (T. 307). She called the police, and Patrolman Fowler came to the scene. (T. 308, 311–312). Parris kept saying, "Days Inn, Days Inn," and Fowler called an ambulance. (T. 314–315). As a result of what Parris told Officer Fowler, an all points bulletin issued for a black male, meeting the description of short, medium complexion, wearing a brown hat, and driving a blue Pinto automobile.

Later that morning, Patrolman Nash saw petitioner driving a blue Pinto. Since petitioner and the auto fit the description that Nash had been given earlier (T. 347–348), Nash stopped petitioner on West Hancock Street and checked petitioner's license. (T. 348, 350–351). When the officer noticed petitioner trying to stuff something under the seat of the car, the officer ordered him back to the squad car. (T. 351–352).

Policewoman Pickett also came to West Hancock Street, and as she walked toward Officer Nash's car she looked into the Pinto and saw something red on the front seat. (T. 428–429). She noticed petitioner bending over in the police car. Officer Nash then found two rolls of dimes underneath the front seat. (T. 353–354, 448).

Detective Collinsworth patted down petitioner and discovered a roll of money totaling $260.00 in petitioner's right front shirt pocket. (T. 451, 485). In the car were fifty dollars and a slug with some hair on it. (T. 361, 451–452, 464, 486). Microanalyst Tillman Testified that Parris' hair and the hair on the bullet had a common origin. (T. 629). Blood found on the seat and floor mat of the Pinto matched Parris' blood

type, but it did not match petitioner's blood type. (T. 355, 361, 668).

After petitioner was taken to the Clarke County Police Department, he told police that he lived at 170 Macon Avenue and had borrowed his sister's car at 8:00 a.m. that morning, January 29th. (T. 585). Detective Collinsworth went to that address and discovered that only petitioner's sister, Jacklyn Thomas, and his mother, Alberta Thomas, lived there. (T. 488). Jacklyn Thomas told the detective that she had loaned her blue 1973 Pinto to her brother on the previous evening at approximately 9:00 p.m. (T. 567–569, 573).

Detective Collinsworth went to where Alberta Thomas worked, and Mrs. Thomas told him her son's (petitioner's) address was 550 West Hancock Street. (T. 490). After getting a search warrant for petitioner's 550 West Hancock Street apartment, the detective searched petitioner's apartment and found Parris' boots, wallet, car keys, check stubs, and payroll checks inside. (T. 241–245, 514, 516, 518, 520). The detective also found Sims' pistol, which then contained one live round. Two spent cartridges and the Days Inn key were in petitioner's trash can. (T. 183, 458, 515, 518, 526, 529). The detective further found blood on the kitchen linoleum, a pair of brown pants, Parris' boots, and a book of matches. (T. 242, 458, 514–515).

The victim, David Parris, testified at trial that petitioner was the black male who robbed and shot him. (T. 262).

Petitioner did not testify in his behalf or offer any evidence. (T. 733).

### Sufficiency of the Evidence

In *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the Supreme Court of the United States held that habeas corpus relief is appropriate if a conviction rests upon constitutionally insufficient evidence. In *Jackson*, the Supreme Court held that the test to be applied to determine whether the evidence is constitutionally insufficient is, "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational

trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319, 99 S.Ct. at 2789 (emphasis in original).

Applying that test to the just recited evidence, and viewing such evidence in the light most favorable to the prosecution, it is obvious, if not "as plain as the nose on your face," that any rational trier of fact could have found the essential elements of the crimes of armed robbery and kidnapping beyond a reasonable doubt. Indeed, if the constitutional test were "beyond all possible doubt," the evidence as recited and found in the transcript of petitioner's trial would satisfy even that more stringent test. Petitioner's claim of insufficiency of the evidence is, therefore, simply without merit.

### Ineffective Assistance of Counsel

Since petitioner's court appointed counsel, Robert Peckham, had not been a witness at any stage of petitioner's state court proceedings, direct appeal or habeas, this court held an evidentiary hearing to afford petitioner the opportunity to produce evidence in support of his claim of ineffective assistance of counsel. Court appointed counsel vigorously represented petitioner during that hearing. Mr. Peckham testified, but understandably did not have an independent recollection of all that had transpired in 1977, some nine years ago, between him and the defendant. To assist the court in filling in his memory gaps, the court requested the witness to attempt to locate his office file. After the hearing, this file was located and produced to the court and counsel. The court, in assessing petitioner's claim of ineffective assistance of counsel, thus has before it the transcript of petitioner's trial, the testimony of appointed counsel, counsel's office file, petitioner's testimony, appellate briefs of appointed counsel, and the written and oral contentions of habeas counsel.

In the trial counsel's office file there is a letter dated January 31, 1977, from Superior Court Judge James Barrow to Robert D.

Peckham requesting that he "undertake to represent this defendant by appointment of the court." A date stamp showing February 2, 1977, indicates date of receipt by Mr. Peckham. Mr. Peckham, a retired United States Army Colonel and attorney at law, was then and for many years had been Director of the University of Georgia's Legal Aid and Defender Society which, by contract with Clarke and Oconee Counties, defended all indigent criminal defendants in those counties. In addition to Mr. Peckham, several other lawyers were full-time employees of the Legal Aid and Defender Society, and of those, Mr. Jack Affleck, Jr. seemed to be primarily responsible for assisting Mr. Peckham in defending Mr. Thomas. Petitioner was thereby represented by Mr. Peckham and all the lawyers employed by the Legal Aid and Defender Society. Mr. Peckham, as Director, acted as lead counsel.

In trial counsel's file there is an interview sheet evidencing that on February 17, 1977, petitioner was interviewed and told that the Legal Aid and Defender Program would represent him. The interviewer was a Mr. McLarty. According to these records, petitioner told the interviewer that he had been convicted of armed robbery in 1973, had been sentenced to five years for this offense, and had actually served three years and six months of that sentence. As to the offense in question, the notes of the interviewer state:

> 29 January 77. Days Inn Armed Robbery—Defendant alleges he was arrested 29 Jan 77 for D.U.I. by Athens City Police—Brought to Clarke County Jail—charged by County Police w/Armed Robbery, Kidnapping, Agg. Assault.
> Defendant worked for Janitorial Service w/Office Security on Prince Ave—8 a.m. to 4 p.m., then 4:30 p.m.—9:30 p.m. (Was working until 9 p.m. 28 Jan 77)—Defendant went to borrow sister's Blue Pinto, 1973—got car & left w/James Moses (ex-policeman) [They had come in company truck]—They then went to take truck back "Got back around 9:15). Then went in Pinto to Moses' car at 745 Prince Ave. time: 9:30 p.m. Defendant then rode around went to "Brooklyn" for a couple of beers.—Got there around 9:45—left around 10:15—picked up Robert Jackson while drinking. They went to Milton's Club @ Broad Street—left around 11 p.m. (also had someone known as Lee Cole & Joseph Latimore)—Went to Rocksprings Homes to see a girl Ora Jean—Drank some liquor (all 5 of them)—Left around midnight & went to Milton's again (all but Ora Jean)—went out to Brooklyn again (all 4 of them)—got there around 12:30. Defendant claims he passed out (was drugged)—Defendant woke up in A.M. around 7:15—in sister's car at corner of Reece & Franklin (between Chase & Milledge)—Went to McDonald's on Prince to eat. On way to work—Defendant was stopped for D.U.I. by Athens Police. Defendant does not remember anything from 1 a.m. til 7:15.

Trial counsel's file also contains copies of many cases on the constitutionality of searches, lists of jurors, trial notes, and copies of all briefs submitted. This material, coupled with Mr. Peckham's testimony before this court, convinces this court that Mr. Peckham and the Legal Aid and Defender Program lawyers, after agreeing to represent petitioner Thomas, had interviewed him at great length, but despite this deligence, were simply unable to prove petitioner's contention that after leaving Brooklyn he had passed out in his sister's car and had remained there between the hours of 12:30 a.m. and 7:15 a.m. Counsel further learned that petitioner had told a different exculpatory story to the police and also learned of the overwhelming evidence of petitioner's guilt, which included the $300 found on petitioner or in the car, blood on the passenger seat and floorboard of the Pinto, the spent bullet in the Pinto, blood on the floor of petitioner's apartment, and the victim's personal possessions in petitioner's apartment. Counsel found that neither petitioner's mother, sister, brother, nor any other person named by him would support his allegation that he was somewhere else at the time of the robbery.

Mr. Peckham accurately testified as to the efforts he and other defender lawyers made to defend petitioner:

Q I'm trying to find out though, Colonel Peckham, just what you did to represent this man who was charged with a capital offense at that time.

A All right, sir. I didn't represent him at the preliminary hearing because there wasn't one. We were not entitled to one. I went to see him in the jail, I interviewed him, I talked to him, I talked to his family members, I talked to the police, went to the scene of the crime, we got the jury list, we went over the people that were going to be on the jury, got a line on who they were.

Q And what else did you do?

A I can't tell you everything I did, sir, but I prepared for this case as I normally would prepare for any trial and since this was a capital case, it was a very important case as far as I was concerned.

Q All right, sir, now according to your recollection and without the benefit of looking at your files for the last seven or eight years, how many times would you say that you conferred with this petitioner before you went to trial?

A I can't say, sir.

Q Do you have any recollection of him giving you names of witnesses who would support his contention that he was innocent of the charges?

A I know this; I can't remember any names he gave us but I will tell you this, we were grasping for straws. Had he given me the name of anybody that would support his contention, his alibi, we would have seen them and we did see them, if he gave us—because we exhausted ourselves trying to prepare for this case.

Q So, what you're saying is, according to your recollection, he didn't give you any names of witnesses who would support his contention?

A He might have given me names but if we talked to these witnesses—let's put it this way, we could find no witnesses that would support his contentions. His own sister wouldn't even support his contentions.

At the trial of petitioner, Mr. Peckham made appropriate motions to the court; he demonstrated that he was familiar with and had knowledge of the evidence, which could only have come from investigation and preparation of the case; he did not make an issue of petitioner's arrest because of trial strategy reasons; he competently cross-examined every prosecution witness; he seized upon every possible constitutional and legal argument available; he argued petitioner's cause most competently; and otherwise did a superb job of defending the indefensible.

Petitioner Thomas asserted ineffective assistance of counsel to the appellate courts of this state and to this court. In doing so, he has produced no witness to support his alibi, yet, he continues to suggest, that but for the ineffective assistance of his counsel, he could have proven this alibi in the Clarke Superior Court. Given the evidence against petitioner, however, it is this court's considered judgment that even "Houdini couldn't have figured an out" for petitioner in this case.

Superior Court Judge Barrow also explained to the petitioner his right not to testify, and petitioner then elected not to testify. Petitioner now alleges that he subsequently changed his mind, that he did want to testify, but that he was prevented from testifying because his lawyer failed to communicate this desire to the trial judge. Mr. Peckham doesn't remember the specifics of what petitioner said, but does know that he always permitted defendants that want to testify to do so, even if, as a matter of trial strategy, they should not testify. This court credits the testimony of Mr. Peckham and finds that had petitioner told Mr. Peckham that he wanted to testify, he would have been immediately allowed to do so. Since he did not testify, this court finds that petitioner did not change his mind. This conclusion is buttressed by the fact that having been convicted in 1973 of armed robbery, petitioner, had he testified, could have been questioned about that con-

viction. That inevitable possibility reinforces this court's belief that Albert Thomas decided not to testify and stuck by that decision.

The standard for judging appointed counsel's conduct is set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Petitioner, by that decision, is required to show that counsel's performance fell below an objective standard of reasonableness, and further that this deficient performance prejudiced petitioner's defense. Everything that petitioner points to as deficiencies in the court appointed counsel's performance has been carefully considered by this trial judge. This court finds that nothing done by the court appointed counsel fell below an objective standard of reasonableness. Even if it had, however, petitioner has made no showing of possible prejudice to his defense that was caused by anything appointed counsel did or failed to do. Petitioner's claim of ineffective assistance of counsel, therefore, is totally without merit.

### Indictment Containing Prior Conviction

Petitioner contends that the jury, in deciding his guilt, was permitted to know of his prior conviction by being allowed to consider the original indictment, which included a third count wherein it was alleged that petitioner had been convicted in 1973 of armed robbery. The original indictment does include such a third count. That indictment, however, was not given to the jury. The jury was given a copy of the indictment from which the third count had been removed. The verdict of the jury is written on that copy. There is no merit to petitioner's contention, therefore, that the jury was unconstitutionally prejudiced by being given the original indictment.

### Other Contentions

Petitioner is a very competent jailhouse lawyer. Consistent therewith he has flyspecked the transcript of his trial and listed every possible theoretical technicality that can be raised or argued on appeal, direct or

habeas. The alleged technical errors have been carefully considered and found to be without constitutional error.

Accordingly, upon undisputed overwhelming evidence of guilt, this court finds that petitioner has been constitutionally convicted with effective assistance of counsel for the offense of armed robbery and kidnapping and further finds that he was constitutionally sentenced to consecutive terms of life imprisonment for committing these offenses. His petition for a writ of habeas corpus, therefore, is in all respects DENIED.