Albert THOMAS, Plaintiff-Appellant,

v.

Lanson NEWSOME, Warden, Defendant-Appellee.

No. 86–8841

Non-Argument Calendar.

United States Court of Appeals, Eleventh Circuit.

July 20, 1987.

Floyd M. Buford, Macon, Ga. (Court-appointed), for plaintiff-appellant.

Paula K. Smith, Asst. Atty. Gen., Atlanta, Ga., for defendant-appellee.

Before HILL, FAY and KRAVITCH, Circuit Judges.

HILL, Circuit Judge:

Shortly after 2:00 a.m. on January 28, 1977, appellant Albert Thomas, armed with a pistol he had taken from a friend earlier that evening, robbed a Days Inn Motel in Athens, Georgia and kidnapped David Parris, the night auditor. Thomas forced Parris to undress and tied him up with his own clothes. As they were driving around, and apparently without warning or provocation, Thomas shot Parris in the head. Thomas then drove to a deserted area where he pushed Parris out of the car into a culvert and shot him again in the chest. Thomas drove off leaving his victim to die, nude in the sub-freezing temperature of that January night.

Thomas was indicted and convicted in Georgia state court of armed robbery and kidnapping. He was sentenced to death for the kidnapping and to life imprisonment for the armed robbery. On direct appeal, the Georgia Supreme Court set aside Thomas' death sentence because the victim did not die as a result of the crime.[1] On remand, the trial court imposed a second life sentence for the kidnapping count, to be served consecutively to his original life sentence for the armed robbery. This new sentence was affirmed by the Georgia Court of Appeals. *Thomas v. State*, 150 Ga.App. 341, 258 S.E.2d 28 (1979). After exhausting his state habeas remedies, Thomas filed for federal habeas corpus relief pursuant to 28 U.S.C. § 2254, which was denied by the district court. 646 F.Supp. 583 (N.D.Ga.1986).

In this appeal, Thomas attacks his conviction and sentence on three grounds. First, he argues that he received ineffective assistance of counsel because his trial counsel failed to challenge the legality of his arrest and the admission of crucial evidence discovered as a result of his arrest.

---

1. *See Collins v. State*, 239 Ga. 400, 402, 236 S.E.2d 759, 761 (1977) (recognizing that after *Coker v. Georgia*, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977), and *Eberheart v. Georgia*, 433 U.S. 917, 97 S.Ct. 2994, 53 L.Ed.2d 1104 (1977), death sentence may not be imposed for crime of kidnapping where victim is not killed).

Second, he claims that the district court erroneously determined that the jury in its deliberations did not see or consider the original indictment, which included a count alleging that Thomas had previously been convicted of another armed robbery. Finally, Thomas contends that the imposition upon remand of a second consecutive life sentence violates the eighth and fourteenth amendments, as well as the Supreme Court's decision in *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). We reject all of appellant's arguments, and affirm the judgment of the district court.

## I. INEFFECTIVE ASSISTANCE CLAIM

Thomas' claim that he suffered ineffective assistance of counsel at his 1977 trial is governed by the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to prevail, the petitioner must first show that his counsel's performance was so deficient that it fell below an objective standard of reasonableness. *Id.* at 687–88, 104 S.Ct. at 2064–65. In addition, he must demonstrate actual prejudice, *i.e.*, a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694, 104 S.Ct. at 2068. Recently, in *Kimmelman v. Morrison*, 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986), the Supreme Court addressed the situation where the principal allegation of ineffectiveness is defense counsel's failure to litigate competently a fourth amendment claim. In such a case, the Court held that the petitioner "must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate the actual prejudice." *Id.* at ——, 106 S.Ct. at 2583.

The district court found that "nothing done by [Thomas'] counsel fell below an objective standard of reasonableness.

Even if it had, however, petitioner has made no showing of possible prejudice to his defense that was caused by anything appointed counsel did or failed to do." Dist.Ct.Order 646 at 589. Thomas disputes this determination, contending that he was arrested without probable cause, and therefore all the evidence seized as a result of his arrest should have been excluded as "fruit of the poisonous tree." We reject Thomas' arguments, concluding that he cannot prove actual prejudice in the form of a meritorious fourth amendment claim as required by *Kimmelman*. A review of the sequence of events leading to his arrest reveals that Thomas was properly stopped and then lawfully arrested.

After Thomas shot Parris and left him for dead in the culvert, Parris miraculously managed to pull on his pants and crawl up to the side of the road. A passing motorist spotted Parris at approximately 3:00 a.m. and notified the police. When Officer Fowler arrived at the scene, Parris was still able to talk, and apparently based upon what Parris told Fowler, the officer called in an all-points bulletin describing the assailant as a short black male, medium complexion, wearing a brown hat, and driving a blue Pinto automobile.

Later that morning, at approximately 9:20 a.m., Officer Nash of the Athens Police Department observed a car fitting the description in the bulletin being driven by a black male. Nash stopped the car, which was being driven by Thomas, and asked to see his driver's license. While Nash was in the process of conducting a license check, he noticed Thomas in the car ahead trying to stuff something under the seat. Nash then asked Thomas to step out of the car so he could conduct a pat-down search for weapons, after which the officer told Thomas to wait in the patrol car because of the cold weather.

Officer Pickett arrived at the scene immediately after Thomas had been placed in the patrol car. While the two officers waited for the results of the license check, they walked by the Pinto and saw something red

which appeared to be blood on the front seat. They also noticed Thomas bending over in the police car apparently attempting to hide something. At that point Pickett advised Thomas of his *Miranda* rights. Upon inspection Nash found two rolls of dimes underneath the front seat of the patrol car, and a pat-down search of Thomas revealed $260.00 in his shirt pocket. The officers then searched the Pinto and found fifty $1 bills stuck between the driver's seat and the console, in addition to a slug with blood and hair on it lying on the car floor. The hair found on the bullet was later identified as having a common origin as that of Parris; the blood found on the seat and floor mat matched Parris' blood type, but was not the same type as Thomas' blood.

Thomas was taken to Clarke County Police Department, where he told police that he lived at 170 Macon Avenue and that he had borrowed his sister's car at 8:00 a.m. that Saturday morning. When detectives went to the address given by Thomas, however, they learned that only Thomas' sister and mother lived there. In addition, Thomas' sister told police that she had loaned her blue Pinto to her brother at approximately 9:00 p.m. the previous evening. Thomas' mother told police that his true address was 550 West Hancock Street. After obtaining a search warrant for that address, a detective searched Thomas' apartment and found a wallet, boots, car keys, check stubs, and payroll checks all belonging to Parris. The detective also found a pistol in the apartment, plus two spent cartridges and a Days Inn key in a trash can.

Thomas claims that Officer Nash did not have probable cause to arrest him, and therefore all the evidence seized from both the car and his apartment was tainted by the unlawful arrest. Probable cause to arrest exists "where the facts and circumstances within the collective knowledge of the law enforcement officials, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that an offense has been or is being committed." *United States v. Blasco,* 702 F.2d 1315, 1324 (11th Cir.), *cert. denied,* 464 U.S. 914, 104 S.Ct. 275, 276, 78 L.Ed.2d 256 (1983); *United States v. Agostino,* 608 F.2d 1035, 1037 (5th Cir.1979).[2] Thomas contends that the arrest was consummated at the time Officer Nash ordered him to get out of his automobile and to wait in the patrol car; thus, he argues that for the arrest to be legal the officer must have had sufficient probable cause at the time he made the stop.

Even assuming that the information in the police bulletin was not enough in itself to establish probable cause,[3] we disagree that Thomas was subjected to an unlawful arrest. We also disagree that he was effectively placed under arrest when Officer Nash instructed him to wait in the patrol car. Instead, the officer's initial decision to stop the car was a permissible "investigative stop" under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny. In evaluating the reasonableness

---

**2.** The Eleventh Circuit has adopted as precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

**3.** It is arguable that the information Officer Nash received from the police bulletin did constitute probable cause for Thomas' arrest. Thomas matched the rough description given by the victim; he was driving the same type of car as that described by the victim; and the stop occurred only several hours after the assault was committed. *See, e.g., Chambers v. Maroney,* 399 U.S. 42, 46–47, 90 S.Ct. 1975, 1978–79, 26 L.Ed.2d 419 (1970) (police had probable cause to arrest suspects whose clothing and car matched description given by victim and witnesses); *United States v. Johnson,* 741 F.2d 1338, 1340 (11th Cir.1984) (facts established probable cause where suspect fit rough description of robber and was driving car that had been observed leaving scene of crime), *cert. denied,* 471 U.S. 1117, 105 S.Ct. 2362, 86 L.Ed.2d 262 (1985); *Shriner v. Wainwright,* 715 F.2d 1452, 1454 (11th Cir.1983) (probable cause existed where police encountered suspect meeting description in police bulletin in both temporal and geographic proximity to the crime scene), *cert. denied,* 465 U.S. 1051, 104 S.Ct. 1328, 79 L.Ed.2d 723 (1984).

of a *Terry* stop, a reviewing court must examine "whether an officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (quoting *Terry,* 392 U.S. at 20, 88 S.Ct. at 1879).

The descriptions in the police bulletin clearly were sufficient to justify detaining Thomas based upon the reasonable suspicion that he was wanted for past criminal conduct.[4] In *United States v. Hensley,* 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985), the Supreme Court recently announced that

> if a ["wanted"] flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification, ... to pose questions to the person, or to detain the person briefly while attempting to obtain further information.

469 U.S. at 232, 105 S.Ct. at 682–83 (citations omitted); *see also United States v. Cortez,* 449 U.S. 411, 418 n. 2, 101 S.Ct. 690, 695 n. 2, 66 L.Ed.2d 621 (1981); *United States v. Roper,* 702 F.2d 984, 989 (11th Cir.1983). The police bulletin in this case was adequately supported by the first-hand observations of the victim as related to Officer Fowler; therefore, Officer Nash was justified in making the investigative stop in reliance on the bulletin.

Further, the scope of the stop was reasonably related to its purpose. Officer Nash was merely conducting a license check, when he observed Thomas attempting to hide something under his seat in the Pinto. The officer removed Thomas from his vehicle in order to keep him from destroying evidence and to maintain the status quo while waiting for the results of the license check; he told Thomas to wait in the patrol car presumably because of the cold temperature outside.[5] Officer Pickett arrived immediately thereafter and saw bloodstains in plain view on the seat of the Pinto, at which time she gave Thomas his *Miranda* warnings. We hold that the arrest did not occur until this point, after the legitimate discovery of additional evidence caused the officers' reasonable suspicion to ripen into probable cause for Thomas' arrest. The arrest being proper, the officers' subsequent search of the Pinto was justified as being incident to a lawful arrest. *See New York v. Belton,* 453 U.S. 454, 460, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981).

Thomas makes much of the fact that Officer Nash placed him into the patrol car after initially ordering him out of the Pinto. Such conduct, however, does not automatically convert a *Terry* stop into a de facto arrest requiring probable cause. This court recently has made clear that "the use of a particular method to restrain a person's freedom of movement does not necessarily make police action tantamount to an arrest." *United States v. Kapperman,* 764 F.2d 786, 790 n. 4 (11th Cir.1985). Dur-

---

4. Thomas' argument that the decision in *United States v. Rias,* 524 F.2d 118 (5th Cir.1975) should control this case is not persuasive. In *Rias,* the court concluded that a police report describing the suspects only as two black males driving a black or blue Chevrolet did not give officers sufficient reasonable suspicion to stop a vehicle meeting that vague description. *Rias,* 524 F.2d at 121. In this case, however, the vehicle description was much more specific than in *Rias,* a blue Pinto as opposed to a black or blue Chevrolet, and the description of the suspect here was more specific. Moreover, the stop in this case occurred only several hours after the commission of the crime, while the stop in *Rias* occurred at least two weeks after the last robbery in question. *Id.*

5. Thomas cannot claim that the duration of the encounter exceeded the permissible scope of a *Terry* stop. In *Sharpe,* the Supreme Court held that a twenty minute detention was not unreasonable under *Terry* where police acted diligently in pursuing a legitimate means of investigation. *Sharpe,* 470 U.S. at 688, 105 S.Ct. at 1576. Here, the officers acted diligently in conducting the license check and pursuing other legitimate means of investigation, such as making "plain view" observations of the vehicle, which resulted in additional evidence confirming their suspicions.

ing the course of certain police-citizen encounters not rising to the level of a full-scale arrest, "[p]olice may take reasonable action, based upon the circumstances, to protect themselves ... or to maintain the status quo." *Id.* Under this analysis, Officer Nash was justified in placing Thomas in the patrol car for the duration of the license check after he observed Thomas trying to hide something under the seat of the Pinto. The officer's conduct obviously was undertaken to maintain the status quo during the course of a reasonable investigative stop and thus did not constitute a de facto arrest.

■ In sum, the initial stop was justified in its inception and reasonable in its scope. The officers acted diligently and reasonably in preserving the status quo while conducting their investigation. When their additional observations gave them sufficient probable cause for arrest, the officers acted properly in advising Thomas of his *Miranda* rights and then searching the vehicle. The incriminating evidence obtained from both the vehicle and Thomas' apartment therefore was not the fruit of an unlawful arrest, and was properly admitted against him at trial. Because Thomas does not have a meritorious fourth amendment claim, he cannot meet the standards under *Strickland* and *Kimmelman* to prevail on his claim that counsel was ineffective for not challenging his arrest.

## II. JURY'S CONSIDERATION OF INDICTMENT

■ The original indictment issued against Thomas included a count alleging that he had previously been convicted of another armed robbery. Thomas argued to the district court that the jury was improperly given a copy of that original indictment. The district court found, however, that the jury was not given the original

indictment, but instead was given a "dummy" indictment which did not contain the recidivist count. Thomas now argues that this finding by the district court was clearly erroneous. We hold that the evidence in the record amply supports the district court's finding on this issue. The district court heard live testimony from both appellant and his trial counsel, and it obviously chose to credit counsel's version of the events in question. We note the particular deference that a reviewing court must give to findings of fact based upon the trial court's credibility judgments of live witnesses. *See Anderson v. City of Bessemer City,* 470 U.S. 564, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985); Fed.R.Civ.P. 52(a).

## III. CHALLENGE TO RESENTENCING

The state trial court originally sentenced Thomas to death for the kidnapping and to life imprisonment for the armed robbery, presumably to run concurrently.[6] The death sentence was set aside on direct appeal, and the case was remanded to the trial court for resentencing on the kidnapping count. Upon resentencing, the trial court imposed a second life sentence for the kidnapping, specifically directing that it was to run consecutively to the original life sentence for the armed robbery. Citing *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), Thomas now complains that the trial court imposed a harsher sentence after remand than that originally imposed, in violation of the eighth and fourteenth amendments. We find this argument to be totally lacking in merit.

■ In *Pearce,* the Supreme Court declared that where a defendant has successfully attacked his conviction, the imposition of a more severe sentence after retrial violates due process unless there is some affirmative showing in the record of con-

6. Georgia law provides that where a defendant is convicted on more than one count or indictment and is sentenced to imprisonment, the sentences shall be served concurrently unless otherwise expressly specified. O.C.G.A. § 17-10-10(a) (1982).

duct by the defendant occurring after the original sentencing proceeding which justifies the increased sentence. 395 U.S. at 726, 89 S.Ct. at 2081. The *Pearce* Court stressed that vindictiveness against a defendant for having successfully attacked his conviction must play no part in his resentencing after a new trial, lest the fear of such vindictiveness deter a defendant's exercise of his right to appeal or otherwise attack his conviction. *Id.* at 725, 89 S.Ct. at 2080. In this case, however, Thomas cannot meet the obvious threshold requirement of *Pearce:* that his second sentence is more severe than his initial sentence. Undoubtedly, a death sentence, even when imposed concurrently with a life sentence, is more severe than two life sentences, whether imposed concurrently or consecutively to each other. This point is best illustrated by the absurdity of our requiring the reinstatement of the original sentence, or giving Thomas the opportunity to choose which of the two sentences he would prefer. Suffice it to say that the important constitutional concerns manifested in *Pearce* clearly do not dictate the outrageous position advocated by this appellant.

For the foregoing reasons, the decision of the district court denying Thomas a writ of habeas corpus is

AFFIRMED.