[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-13890
Non-Argument Calendar
_____

D.C. Docket No. 6:12-cr-00275-JA-GJK-1

UNITED STATES OF AMERICA,

Petitioner-Appellee,

versus

KAMERON E. MCCALL,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(April 18, 2014)

Before TJOFLAT, PRYOR and JORDAN, Circuit Judges.

PER CURIAM:

Kameron E. McCall appeals his conviction for possession of a firearm by a convicted felon. See 18 U.S.C. §§ 922(g)(1), 924(a)(2). McCall challenges the denial of his motion to suppress the firearm and his inculpatory statement to police on the ground that officers lacked reasonable suspicion to stop the vehicle in which he was a passenger. We affirm.

## I. BACKGROUND

Around 12:25 a.m. on November 20, 2011, Arthur Fisher called 911 to report that he had been struck on the head and then robbed of his car keys and cellular telephone at gunpoint outside his residence in the Willows Apartments off Silver Star Road. Fisher stated that he had been robbed by three black men who had arrived in a red Dodge Charger vehicle and that he thought they had stolen his rental vehicle, a 2011 model Charger, which was painted white. Fisher was able to describe two of the three robbers: one man was short with a beard and was wearing a white shirt and pink plaid shorts, and a second man was wearing a white shirt and his hair was styled in long dreadlocks. At 12:30 a.m., a dispatcher for the Police Department of the City of Orlando issued a be-on-the-lookout for Fisher's rented Charger vehicle and the armed robbers.

Officer Christopher Bigelow and Detective Jeffrey Backhaus responded to the dispatch. At 12:32 a.m., as the officers traveled northbound on John Young Parkway toward the Willows Apartments, they noticed in the traffic ahead of them

2

a white Charger vehicle.  Bigelow recognized the vehicle as a 2011 model because of its "very distinct light bar" that was "very easy to find in taillights of vehicles." Bigelow also noticed that there were "multiple" occupants in the vehicle.

Bigelow and Backhaus requested assistance to stop the Charger vehicle and reported its license tag number.  Dispatch responded that the vehicle had not been reported stolen.  Bigelow and Backhaus thought the report was consistent with their rapid discovery of the vehicle following the 911 call, and they could not confirm whether the license tag matched that of Fisher's vehicle because officers were still en route to Fisher's apartment.

The officers followed the Charger vehicle to a RaceTrac gas station at 5051 Edgewater Drive.  The gas station was approximately four miles from the Willows Apartments.  After the Charger vehicle stopped next to a gas pump, Bigelow and Backhaus's patrol car and a second patrol car blocked the vehicle.   Bigelow and Backhaus approached the Charger vehicle with their firearms drawn.

Bigelow opened the front passenger door of the Charger vehicle, noticed a scent of marijuana, and removed McCall from the passenger seat.  Bigelow obtained McCall's identification information and requested that dispatch run a background check.  At 12:36 a.m., Bigelow received a teletype stating that there was a warrant outstanding for McCall's arrest.  Bigelow requested that dispatch confirm the warrant while he searched the Charger vehicle.  Bigelow discovered

3

marijuana and other drugs in the center console of the vehicle. Bigelow also discovered a rental agreement in the glove compartment. At 12.40 a.m., Bigelow received a confirmation that the warrant was still outstanding and arrested McCall. Another officer ran a background check on the driver of the Charger vehicle, Otis Mitchell, and arrested him for driving with a suspended license.

Backhaus returned to the Charger vehicle to look for a gun "because [he] was still under the impression that [they] were dealing with an armed carjacking." After he entered the vehicle, Backhaus detected a scent of marijuana. While "in the backseat of the vehicle, [Backhaus] looked forward" and, "in the glove box, [he] could see . . . a shelf" on which was lying a semiautomatic handgun. Backhaus also noticed a folded piece of yellow paper lying below the shelf. Backhaus unfolded the paper and discovered that it was a "court slip" for McCall.

Backhaus advised McCall of his constitutional rights, see Miranda v Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966), which McCall waived. McCall, who was "very calm," "very cooperative," and "mellow," claimed the handgun. McCall explained that he kept the firearm "for his protection because he was a rapper." McCall disclaimed any knowledge of the drugs.

Meanwhile, Officer Adam Cusumano arrived at the Willows Apartments and interviewed Fisher, who had a mark on his head and acted disoriented. Cusumano and other officers canvassed the area to locate possible witnesses and

4

discovered a Charger vehicle matching the description given by Fisher. The officers notified dispatch that Fisher's vehicle had not been stolen. At 12:57 a.m., Bigelow and Backhaus learned that the Charger vehicle they had stopped was not stolen. Bigelow created a new incident report describing McCall's arrest on the outstanding warrant.

After McCall was charged for being a felon in possession of a firearm, he moved to suppress the firearm and his statement in which he claimed ownership of the weapon. McCall moved for suppression on three grounds: (1) Bigelow and Backhaus lacked reasonable suspicion or probable cause to stop the vehicle, and the firearm and McCall's statement had to be suppressed as fruit of the poisonous tree; (2) the officers lacked authority to search the vehicle for weapons after removing its occupants, see Arizona v. Gant, 556 U.S. 332, 129 S. Ct. 1710 (2009), and Bigelow lacked authority to search the vehicle for marijuana because he failed to request a drug canine to confirm the presence of the illegal substance; and (3) McCall was "never properly advised of his Miranda rights and . . . never voluntarily and knowingly waived [those] rights."

At the hearing on McCall's motion to suppress, Bigelow, Backhaus, and Cusumano testified about the dispatch reporting the stolen vehicle, the events that led to McCall's arrest, and the discovery of Fisher's vehicle. Bigelow and Backhaus identified their incident reports, the dispatcher log, the teletype and

confirmation of McCall's outstanding arrest warrant, and a map of the area where the officers apprehended McCall. Bigelow testified that he arrested McCall on the outstanding warrant before learning that Fisher's vehicle had not been stolen and that the incident report misstated that McCall had not waived his rights before giving a statement.

The district court overruled McCall's motion to suppress. The district court found that the officers' testimonies were credible; the traffic stop occurred before Bigelow and Backhaus learned that the Charger vehicle was not stolen; and McCall's inculpatory statement was made knowingly and voluntarily. The district court ruled that the officers had reasonable suspicion to stop the Charger vehicle because of its "temporal" and "geographic proximity" to the alleged carjacking and because the vehicle and its occupants matched the information in the dispatch. The district court also ruled that Bigelow's detection of marijuana gave him probable cause to search the vehicle; Bigelow lawfully arrested McCall on the outstanding arrest warrant; and discovery of the firearm was inevitable in an inventory search.

## II. STANDARDS OF REVIEW

On denial of a motion to suppress, we review findings of fact for clear error and the application of law to those facts de novo. United States v. Heard, 367 F.3d 1275, 1278 (11th Cir. 2004). We construe all facts in the light most favorable to the government. Id. Arguments for the suppression of evidence that are not raised

in the district court are reviewed for plain error. United States v. Young, 350 F.3d 1302, 1305 (11th Cir. 2003). Plain error occurs when the district court commits an error that is plain, affects the defendant's substantial rights, and "seriously affects the fairness, integrity or public reputation of judicial proceedings." United States v. Spoerke, 568 F.3d 1236, 1244–45 (11th Cir. 2009) (internal quotation marks and citation omitted).

### III. DISCUSSION

McCall argues that Bigelow and Backhaus lacked reasonable suspicion to stop the white Charger vehicle, but McCall's argument is based on grounds that he did not raise in the district court. McCall argues, for the first time, that Fisher's call to 911 was akin to an anonymous tip that the officers failed to corroborate and that "the stop was a mechanical one based only on a match between the observed car and the general description . . . and geographical proximity to the scene." McCall also argues that, because the traffic stop was unlawful, the firearm and inculpatory statement to the police should have been suppressed as fruit of an unlawful seizure. Because we conclude that the officers had reasonable suspicion to stop the Charger vehicle, we need not address whether the seizure of the evidence was unlawful.

The Fourth Amendment protects persons "against unreasonable searches and seizures," U.S. Const. Amend. IV, but it does not forbid a police officer "in

appropriate circumstances and in an appropriate manner [from] approach[ing] a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." Terry v. Ohio, 392 U.S. 1, 22, 88 S. Ct. 1868, 1880 (1968). The Court in Terry held that a police officer may stop and briefly detain a person to investigate further if the officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Id. at 21, 88 S. Ct. at 1880. That rationale is applicable to traffic stops based on a reasonable suspicion that the occupants of the vehicle have, or are about to, violate the law. See United States v. Hensley, 469 U.S. 221, 226, 105 S. Ct. 675, 678 (1985).

Reasonable suspicion is a flexible standard that accounts for the split-second decisions that police officers regularly make. This standard requires that an officer have "some minimal level of objective justification for making [a traffic] stop," but "[t]hat level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence" and is "obviously less demanding than that for probable cause." United States v. Sokolow, 490 U.S. 1, 7, 109 S. Ct. 1581, 1585 (1989). Whether a traffic stop is objectively reasonable is dependent on the totality of the circumstances presented to the officer. Id. at 8, 109 S. Ct. at 1585; United States v. Cortez, 449 U.S. 411, 418, 101 S. Ct. 690, 695 (1981). Our assessment requires consideration of "various objective observations, information from police

8

reports, . . . [and] the modes or patterns of operation of certain kinds of lawbreakers" from which "a trained officer draws inferences and deductions that might well elude an untrained person." Cortez, 449 U.S. at 418, 101 S. Ct. at 695.

The district court did not err in denying McCall's motion to suppress. Bigelow and Backhaus had a reasonable, articulable suspicion of criminal activity to support their decision to stop the Charger vehicle in which McCall was a passenger. Bigelow and Backhaus initiated an investigatory stop after hearing a dispatch report advising them to be on the lookout for a white 2011 Charger vehicle stolen by three black men who were armed. The officers stopped a vehicle that contained "multiple" occupants and, as McCall acknowledges, "was the same make, model, color, and year" as the vehicle reported stolen and "was . . . within a few miles . . . [and] a few minutes of . . . the reported carjacking." See United States v. Osborne, 630 F.2d 374, 378 (5th Cir. 1980). McCall argues that the officers had to observe a traffic violation or suspicious behavior by the occupants of the vehicle before conducting a traffic stop, but "[t]he Supreme Court has rejected efforts to limit investigative stops to situations in which the officer has personally observed suspicious conduct." United States v. Aldridge, 719 F.2d 368, 371 (11th Cir. 1983); see, e.g., Adams v. Williams, 407 U.S. 143, 147, 92 S. Ct. 1921, 1924 (1972) ("reject[ing] [the] argument that reasonable cause for a stop and frisk can only be based on the officer's personal observation, rather than on

9

information supplied by another person"). Because reasonable suspicion is not based on "hard certainties, but [deals] with probabilities," Cortez, 449 U.S. at 418, 101 S. Ct. at 695, the discovery of a Charger vehicle matching the description of the stolen vehicle in an area near the site and within minutes of the robbery was sufficient to make the traffic stop.

The district court did not err, much less plainly err, in failing sua sponte to question the reliability of Fisher's 911 call. Reasonable suspicion may be based on information supplied by another person, as long as the information bears sufficient indicia of reliability. Adams, 407 U.S. at 146–47, 92 S. Ct. at 1923–24. McCall likens Fisher's 911 call to the anonymous tip in Florida v. J.L., 529 U.S. 266, 120 S. Ct. 1375 (2000), but J.L. is distinguishable. "The reliability of a tip . . . [involves] consideration of whether the officer can track down the tipster again," Heard, 367 F.3d at 1279, and unlike the anonymous tipster in J.L., Fisher exposed himself to scrutiny by the police. Fisher identified himself and his location to the police and expected police officers to visit him as part of their investigation. See J.L., 529 U.S. at 270, 120 S. Ct. at 1378 (distinguishing anonymous tips from "a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated"); Adams, 407 U.S. at 146-47, 92 S. Ct. at 1923-24 (noting that a tip was reliable, at least in part, because the informant "might have been subject to immediate arrest for making a false

10

complaint had [the] investigation proved the tip incorrect"). And Fisher reported that the robbers were armed and dangerous, which demanded the immediate attention of the police. See Adams, 407 U.S. at 145, 92 S. Ct. at 1923 ("The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape."). Calls to 911 "are distinctive in that they concern contemporaneous emergency events, not general criminal behavior," and "[i]f law enforcement [cannot] rely on information conveyed by . . . 911 callers, their ability to respond effectively to emergency [or exigent] situations [will] be significantly curtailed." United States v. Holloway, 290 F.3d 1331, 1339 (11th Cir. 2002). Fisher does not cite, nor has our research revealed, any decisions requiring police officers to gather corroborating evidence before acting on an emergency call made by an identifiable victim of a crime.

McCall argues that the description given by Fisher was too vague to justify the traffic stop because many vehicles could have matched his description, but we disagree. Fisher provided the specific make, model, color, and year of the stolen vehicle and stated that it was likely occupied by "multiple" black men. That description narrowed the number of vehicles to provide reasonable suspicion for the traffic stop. See Thomas v. Newsome, 821 F.2d 1550, 1554 n.4 (11th Cir. 1987); Osborne, 630 F.2d at 378. McCall argues that the officers overlooked that

the vehicle was traveling in the direction of the crime scene and that the vehicle had two instead of three occupants, but the officers were not required to eliminate all the circumstances "consistent with innocent travel."  See Sokolow, 490 U.S. at 9–10, 109 S. Ct. at 1586–87.

Bigelow and Backhaus had an objective, reasonable suspicion that justified stopping the Charger vehicle.  Their discovery of the Charger vehicle within a few miles and a few minutes of a reported carjacking gave the officers reason to suspect that "criminal activity [was] afoot."  Terry, 392 U.S. at 30, 88 S. Ct. at 1884.  The officers were justified in forming "a reasonable suspicion of criminal activity . . . by observing exclusively legal activity, even [though] such activity [would have been] seemingly innocuous to the ordinary citizen."  United States v. Lindsey, 482 F.3d 1285, 1290 (11th Cir. 2007) (internal quotation marks and citations omitted).

## IV. CONCLUSION

We **AFFIRM** McCall's conviction.