UNITED STATES of America,
Plaintiff–Appellee,

v.

Augustin GONZALEZ, Defendant–
Appellant.

No. 93–5179.

United States Court of Appeals,
Eleventh Circuit.

Jan. 4, 1996.

Michael Blacker, Miami, FL, for appellant.

Kendall Coffey, U.S. Attorney, Alex Anguiera, Kathy A. Stark, Linda Collins Hertz, Lisa T. Rubio, Anne M. Hayes, Asst. U.S. Attys., Miami, FL, for appellee.

Before KRAVITCH and EDMONDSON, Circuit Judges, and EISELE *, Senior District Judge.

EISELE, Senior District Judge:

Following a jury trial, appellant was convicted of two counts of making false statements to a firearms dealer in connection with the purchase of a firearm (Counts I and II), in violation of 18 U.S.C. § 922(a)(6), and two counts of possession of a firearm by a convicted felon (Counts III and IV), in violation of 18 U.S.C. § 922(g)(1). Appellant was sentenced to a seventy-eight month term of imprisonment for his violations of § 922(g)(1), and a concurrent sixty-month term for his violations of § 922(a)(6). Appellant thereafter filed a timely notice of appeal, challenging both his convictions and sentences. We have jurisdiction pursuant to 28 U.S.C. § 1291. We AFFIRM.

## I.

In August, 1984, appellant began serving a thirteen-year prison term for a violation of federal drug laws.[1] On March 24, 1989, appellant was paroled. On July 5, 1991, the United States Parole Commission (the Commission) was informed that appellant had

---

* Honorable Garnett Thomas Eisele, Senior U.S. District Judge for the District of Arkansas, sitting by designation.

1. Specifically, appellant was convicted of conspiracy to possess cocaine with intent to distribute, in violation of 21 U.S.C. § 846.

allegedly violated the terms of his parole,[2] and on July 8, 1991, the Commission issued a warrant for the "retaking," *i.e.,* arrest, of appellant. See 18 U.S.C. § 4213(a)(2) (repealed Nov. 1, 1986); 28 C.F.R. § 2.44(a)(2) (1991). Shortly thereafter, this warrant was delivered to the United States Marshal for the Southern District of Florida, see 28 C.F.R. § 2.46(a) (1991), the district to which appellant was assigned. However, as appellant's whereabouts were then unknown, this warrant was not immediately executed.

While attempting to execute the Commission's warrant, Deputy Marshal Tom Figmik discovered that appellant had been using the alias "Jorge Lopez,"[3] and in April, 1992, Deputy Marshal Figmik learned, from a confidential informant, that "Jorge Lopez" was believed to have been residing in Miami Lakes, Florida, that he had been seen driving a black Buick Grand National automobile, and that he had also been seen in possession of a firearm. On April 22, 1992, Deputy Marshal Figmik and Special Agent George Mastin of the Bureau of Alcohol, Tobacco and Firearms (BATF) proceeded to the location believed to be "Jorge Lopez'" residence in Miami Lakes. While approaching a traffic signal near this location, the officers noticed that a black Grand National was also approaching the intersection from the opposite direction, and appellant was immediately identified as the driver of the Grand National. The officers then made a U-turn and began to follow appellant. After following him for a short time they decided to stop appellant's vehicle and execute the Commission's arrest warrant. However, when the officers activated the blue light and siren of their unmarked vehicle, appellant refused to stop. The officers pulled along the driver's side of appellant's vehicle, whereupon Deputy Marshal Figmik produced his badge, identified himself as a United States Marshal, and commanded appellant to stop. In response, appellant put his automobile into reverse and began traveling backwards, away from the officers' pursuit, at a relatively high rate of speed. The officers then made a U-turn to follow appellant, and when appellant attempted to turn his automobile around the officers placed their vehicle in appellant's path. Shortly thereafter, the two vehicles collided and the chase ended.[4]

At the conclusion of this chase, the officers alighted and approached appellant's vehicle, at which point Deputy Marshal Figmik noticed appellant reaching over into the front passenger area of the Grand National. Appellant was then quickly pulled from the vehicle, handcuffed, laid on the ground, and placed under arrest. At this point, appellant identified himself as "Jorge Lopez," but soon thereafter he revealed his true identity. Deputy Marshal Figmik then searched the passenger compartment of the Grand National. A closed black leather case was found in the glove compartment. When Deputy Marshal Figmik opened this case, he discovered that it contained a loaded .38 caliber Smith & Wesson revolver. This weapon and a garage door opener were then seized from the vehicle, and shortly thereafter, appellant was taken from the scene and returned to federal custody. A complete inventory of the Grand National (which revealed no additional contraband) was subsequently undertaken.

---

2. Appellant was charged with failure to report to his probation officer, in violation of 28 C.F.R. § 2.40(a)(5) (1991), failure to report a change in residency, in violation of 28 C.F.R. § 2.40(a)(4) (1991), and failure to report a change in employment, in violation of 28 C.F.R. § 2.40(a)(8) (1991).

3. In fact, appellant had secured several identification documents (including a Social Security card and a Florida driver's license) in the name of "Jorge Lopez."

4. There was some dispute whether this collision was caused by appellant ramming the officers' vehicle, as the officers testified, or *vice versa,* as was suggested by the defense during the officers'

cross-examination. This issue was never resolved in the district court. At the time of appellant's indictment, this dispute was highly relevant, as he then faced a charge of assaulting a federal officer with a deadly weapon (the Grand National), in violation of 18 U.S.C. § 111(a)(1) & (b). However, since this count was later dismissed prior to trial upon motion of the government, the above-described dispute is of less importance for purposes of this appeal. Appellant contends, however, that the resolution of this dispute would contribute to the resolution of other credibility issues in the case. We ultimately disagree, and, in light of our ultimate resolution of this appeal, we decline to resolve this dispute.

Later that afternoon, Deputy Marshal Figmik returned to the Miami Lakes residence where appellant had allegedly been staying. There he joined Deputy Marshall Tom McDermott and various other marshals who had this location under surveillance. Approximately forty-five minutes later, the marshals observed Raquel Fernandez[5] (whom the marshals believed to be appellant's girlfriend) leaving the Miami Lakes residence. Deputy Marshal Figmik waited for Raquel to leave the premises, and after she had traveled a block he stopped her car (without any suspicion that she was involved in any criminal activity), ordered her out of the vehicle, and detained her, stating at trial that she was not then free to leave. Deputy Marshal Figmik then attempted to get Raquel to consent to a search of the Miami Lakes property, but she refused, stating that the property was owned by her mother. Deputy Marshal Figmik refused Raquel's request to return to her vehicle and then directed her to walk back to the Miami Lakes property (presumably so he could obtain her assistance in securing a consent to search).

When Raquel returned to the Miami Lakes property, Deputy Marshal Figmik asked her whether she knew appellant. While she denied knowing Augustin Gonzalez, Raquel stated that she had previously dated "Jorge Lopez," that he did not reside at the Miami Lakes residence (though he had previously stayed there as an overnight quest), and that she had not seen him for months. Deputy Marshal Figmik then proceeded to open the garage door of the Miami Lakes property with the door opener he had seized from the Buick Grand National, ostensibly to show Raquel that he knew she was lying about her relationship with appellant. After Raquel closed the garage door with her own opener, Deputy Marshal Figmik reopened it (offering no explanation for this action at trial). Despite Deputy Marshal Figmik's best efforts, Raquel continued to refuse to consent to a search of the Miami Lakes property. She, in effect, advised Deputy Marshal Figmik that he would have to get a warrant, whereupon he apparently departed the scene for the purpose of determining whether a warrant could be obtained. Raquel did, however, agree to call her mother, Maria Fernandez, so that the marshals might attempt to obtain consent from the owner of the property.

When Maria arrived at the Miami Lakes property, Supervisory Marshal Shawn Conboy attempted to get her to consent to a search of her house. Since Maria did not speak English well, Deputy Marshal McDermott translated the substance of Supervisory Marshal Conboy's request in "street Spanish," a rough analog of Maria's native language. Following a conversation with Raquel, Maria declined to offer her consent. She then drove away from the scene by herself, in her own car, to a nearby garage for the purpose of making a telephone call. Maria stated that she thought about calling an attorney, but changed her mind and then drove back to her house. Maria testified that upon her return, the marshals threatened her by telling her that her daughter would go to jail for five years if she did not consent to their search of her home. At some point thereafter, Maria stated that she wanted to go inside and get a drink of water, and Deputy Marshal McDermott, without permission, followed her into the kitchen, stating that she could not go into her house alone. Maria testified that she and Deputy Marshal McDermott went through the garage to get to the kitchen, and that other marshals were at that time searching the garage. Once inside, Deputy Marshal McDermott continued his efforts to obtain Maria's consent to a search of the room formerly occupied by appellant. Maria, according to Deputy Marshal McDermott, finally offered an oral acquiescence to this request, and a written consent-to-search form was executed after she and Deputy Marshal McDermott returned outside the home.[6]

A number of marshals then proceeded to conduct a warrantless search of that portion

---

5. Because we deal in this opinion at length about the conduct of Ms. Raquel Fernandez, and also her mother, Mrs. Maria Fernandez, we will for convenience refer to them from time to time simply as "Raquel" and "Maria."

6. Whether Maria's consent was voluntarily given is an issue that will be discussed later in this opinion.

of the Miami Lakes property that had been previously occupied by appellant. This search revealed a loaded 9mm. Beretta automatic pistol in a closet in that room, as well as two receipts from Collazo's Gun & Ammo, Inc. indicating that both this gun and the previously seized .38 Smith & Wesson had been purchased by appellant under the name "Jorge Lopez."[7] The government's handwriting expert confirmed that appellant had, in fact, signed those receipts in the name of that alias.

After Special Agent Mastin learned that appellant had apparently purchased two firearms from Collazo's Gun & Ammo under a false name, he sought to examine the retailer's records of those transactions, specifically the BATF 4473 forms that were required to be completed prior to the sale of those weapons. See 27 C.F.R. § 178.124(a) (1991). Among the questions that a purchaser was (and is) required to answer on a BATF 4473 form was (and is) whether the purchaser had previously "been convicted in any court of a crime punishable by imprisonment of a term exceeding one year." See 27 C.F.R. § 178.124(f) (1991). The answer "no" appears on both forms.[8]

## II.

■ Appellant argues that the district judge erred in denying his motion to suppress, which sought to suppress all evidence seized from the Buick Grand National (namely the .38 Smith & Wesson), as well as all evidence seized during the warrantless search of the Miami Lakes residence (namely

the 9mm. Beretta and the two gun shop receipts), and any evidence derived therefrom (namely the two BATF 4473 forms). In addressing appellant's arguments on this point, we are required to accept the district court's factual findings as true, unless those findings are shown to be clearly erroneous. *United States v. Green,* 40 F.3d 1167, 1172 (11th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1809, 131 L.Ed.2d 733 (1995); *United States v. Jonas,* 639 F.2d 200, 204 (5th Cir. Unit B Mar. 1981).[9] We must further construe those facts in the light most favorable to the party that prevailed in the district court, which in this case is the United States. *United States v. Hromada,* 49 F.3d 685, 688 (11th Cir.1995); *United States v. Behety,* 32 F.3d 503, 510 (11th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 2568, 132 L.Ed.2d 820 (1995). However, we review the district court's application of the law to those facts *de novo. United States v. Hall,* 47 F.3d 1091, 1094 (11th Cir.), *cert. denied,* — U.S. —, 116 S.Ct. 71, 133 L.Ed.2d 31 (1995); *United States v. Smith,* 39 F.3d 1143, 1144 (11th Cir.1994).

## A.

■ Appellant's first argument focuses upon the seizure of evidence from the Grand National following the warrantless search of that vehicle. While the Supreme Court has repeatedly stressed that "reasonableness" is the ultimate touchstone for addressing the constitutionality of a search under the Fourth Amendment,[10] *e.g., Vernonia Sch. Dist. 47J v. Acton,* — U.S. —, —, 115

---

7. Appellant purchased those guns in January, 1991. The number for the Florida driver's license in the name of "Jorge Lopez" was found on the BATF 4473 forms that were kept by Collazo's Gun and Ammo, Inc. in connection with those purchases. See 27 C.F.R. § 178.124(c)(1) (1991).

8. Actually, the record is unclear whether appellant or the gun shop proprietor actually printed the word "no" on the BATF 4473 forms. However, the government's handwriting expert testified that appellant had, in fact, signed those forms (albeit in the name of "Jorge Lopez"), and this conclusion was bolstered by the fact that appellant's palm print was found on one of the BATF 4473 forms (the form filled out in connection with his purchase of the 9mm. Beretta).

There was a stipulation with respect to the introduction of those forms which is the subject of one of appellant's arguments on this appeal. See Part III *infra.*

9. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), we adopted as binding precedent all decisions of the prior Fifth Circuit decided prior to October 1, 1981.

10. "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

S.Ct. 2386, 2390, 132 L.Ed.2d 564 (1995); *Florida v. Jimeno,* 500 U.S. 248, 250, 111 S.Ct. 1801, 1803, 114 L.Ed.2d 297 (1991), the High Court has also recognized that a warrant is usually required "[w]here a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing." *Vernonia Sch. Dist. 47J v. Acton, supra,* —— U.S. at ——, 115 S.Ct. at 2390. Thus, the general rule in the criminal context is that warrantless searches " 'are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' " *Mincey v. Arizona,* 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290 (1978) (quoting *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967)); *see also United States v. McGregor,* 31 F.3d 1067, 1068 (11th Cir.1994) ("A warrantless search is presumptively unreasonable."). In rejecting appellant's argument that the officers' warrantless [11] search of the Buick Grand National, and their subsequent seizure of evidence, was unconstitutional, the district court concluded that the officers' search was justified—*i.e.,* was constitutionally reasonable—under any one of three recognized exceptions to the otherwise applicable Warrant Clause. Specifically, the district court concluded that the officers' search (and seizure) was justified as a search incident to a lawful arrest; [12] as an "inventory search"; [13] and as a search permissible under the so-called "automobile exception." [14] As we are satisfied that the first of the district court's rationales is entirely adequate to justify the officers' warrantless search and seizure of evidence from the Grand National automobile—albeit for reasons somewhat different than those advanced by the district court [15]—we need not decide whether the district court's alternative rationales would likewise suffice. In connection with the district court's conclusion that the search of the glove compartment could be justified as having been incident to a lawful arrest, we note the district judge's following comment: "He [Deputy Marshal Figmik] was entitled under Supreme Court cases, *New York vs. Belton,* in particular, ... to examine after a defendant was under arrest a closed compartment or a glove compartment."

When an occupant of an automobile is the subject of a lawful arrest, the Fourth Amendment permits the arresting officers to contemporaneously conduct a warrantless search not only of the occupant himself, *see United States v. Robinson, supra,* but also of the passenger compartment of the automobile, as well as any closed (or open) containers found in this area of the automobile. *New York v. Belton,* 453 U.S. 454, 460, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981); *United States v. Diaz–Lizaraza,* 981 F.2d

---

**11.** Although the officers possessed the Commission's "retaking," *i.e.,* arrest, warrant which (ostensibly) authorized the arrest of appellant, it is clear that that warrant, standing alone, did not authorize the search of the automobile.

**12.** See *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

**13.** See *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976).

**14.** The term "automobile exception" is somewhat of a misnomer, since the Supreme Court has expressly stated that there is "no general 'automobile exception' to the warrant requirement." *South Dakota v. Opperman, supra,* 428 U.S. at 382, 96 S.Ct. at 3103. Rather, this term-of-art is better understood as simply embracing the now-settled doctrine that it is permissible to conduct a warrantless search of an automobile, and any containers found therein, provided that, at the time of the search, there is probable cause to believe that contraband is secreted at some unspecified location within the automobile. *California v. Acevedo,* 500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1992); *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). Of course, if the police have probable cause to believe that contraband is located in a specific area of the automobile, then a warrantless search of the entire automobile is impermissible. *See Arkansas v. Sanders,* 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979).

**15.** In evaluating the district court's ruling on the motion to suppress, we are not strictly bound by the legal analysis relied upon below, and may affirm as long as the district court's decision is correct as a matter of law. *United States v. Britt,* 508 F.2d 1052, 1055 (5th Cir.) *cert. denied,* 423 U.S. 825, 96 S.Ct. 40, 46 L.Ed.2d 42 (1975); *accord United States v. Garza,* 10 F.3d 1241, 1245 (6th Cir.1993).

1216, 1222 (11th Cir.1993). "Containers," in this context, refer to "any object capable of holding another object," *New York v. Belton, supra,* 453 U.S. at 460 n. 4, 101 S.Ct. at 2864 n. 4, and thus include an automobile's glove compartment (whether locked or unlocked), as well as any containers found therein, such as the zipped leather bag that was discovered in this case. *Ibid.* Therefore, since the arrest of appellant was predicated upon a presumably valid arrest warrant (albeit one issued by the Commission), the government argues that the search of the automobile, and the subsequent seizure of the .38 Smith & Wesson, fall squarely within the holding of *New York v. Belton.*

■ Appellant, however, contends that *Belton* is not controlling. Appellant argues that the Commission's arrest warrant was not a lawful "warrant" within the meaning of the Fourth Amendment, and that his arrest, which was initially predicated solely upon the authority of that warrant, was therefore illegal (*i.e.,* was made without a valid warrant and without probable cause), and that consequently the "search incident to arrest" rationale cannot serve to validate the warrantless search of the Buick Grand National. Appellant's argument is founded upon three premises: (1) absent probable cause to believe a crime had been committed (which he contends was then lacking), a warrant was constitutionally required to effectuate appellant's arrest; (2) the Commission, an office of the Executive Branch, *see* 18 U.S.C. § 4202 (repealed Nov. 1, 1986), was (and is) not a "neutral and detached magistrate" qualified to issue warrants under the Fourth Amendment; and (3) the Commission's warrant was the sole source of the probable cause needed to sustain his arrest.

Under the facts presented by this case, we conclude that appellant's first and third premises are defective, and that these defects are ultimately fatal to appellant's argument on this point. We thus decline appellant's invitation to explore the various interesting issues raised when one considers the implications of the Fourth Amendment's application (if any) to the Commission's authority to issue arrest warrants for alleged parole violators.[16] Even if it is assumed, for whatever reason, that the arresting officers in this case lacked probable cause (or reasonable suspicion) to arrest (or otherwise detain) appellant at the time they first observed appellant and attempted to stop him, and that their initial efforts to stop appellant's vehicle were therefore improper, see *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), the resulting arrest of appellant was nevertheless rendered lawful by appellant's subsequent conduct. Rather than submit to the officers' lawful show of authority, appellant attempted to flee, engaging the officers in a reckless chase that ended only when appellant's and the officers' vehicles collided. Those actions resulted in an apparent violation of 18 U.S.C. § 111(a)(1), which makes it a felony for a person to assault a federal officer,[17] or to otherwise disobey a lawful order or offer any resistance to an arrest—including an illegal arrest—by a federal officer. *See United States v. Danehy,* 680 F.2d 1311, 1315–16 (11th Cir.1982). Appellant's actions also resulted in an apparent violation of 18 U.S.C. § 1501, which makes it a felony for any person to impede a federal officer's efforts to serve "any legal or judicial writ or process of any court of the United States, or United States commissioner." It is, of course, settled that a law enforcement officer may effect a warrantless arrest whenever he has proba-

---

**16.** We note, however, that several courts have considered (and rejected) arguments similar to that advanced by appellant. See, *e.g., United States v. Butcher,* 926 F.2d 811, 814 (9th Cir.), cert. denied, 500 U.S. 959, 111 S.Ct. 2273, 114 L.Ed.2d 724 (1991); *United States v. Rabb,* 752 F.2d 1320, 1324 (9th Cir.1984), cert. denied, 471 U.S. 1019, 105 S.Ct. 2027, 85 L.Ed.2d 308 (1985); *United States v. Polito,* 583 F.2d 48, 56 (2d Cir.1978); *Story v. Rives,* 97 F.2d 182, 188 (D.C.Cir.), cert. denied, 305 U.S. 595, 59 S.Ct. 71, 83 L.Ed. 377 (1938). *Jarman v. United States,* 92

F.2d 309, 311 (4th Cir.1937). Indeed, it appears the Supreme Court has impliedly recognized the Commission's authority to issue arrest warrants for alleged parole violators. See *Morrissey v. Brewer,* 408 U.S. 471, 485, 92 S.Ct. 2593, 2602, 33 L.Ed.2d 484 (1972).

**17.** Indeed, it will be remembered that appellant was initially charged with such a violation of § 111(a)(1). See note 4 *supra.* Appellant denies any intentional assault. Nevertheless, he clearly violated the other prohibitions of § 111(a)(1).

ble cause to believe that an individual has committed a felony. *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *United States v. Costa,* 691 F.2d 1358, 1361 (11th Cir.1982). Thus, appellant's apparent violation of the above-referenced criminal statutes served as an independent and valid basis for the probable cause necessary to support his warrantless arrest, even if it is assumed that the Commission's arrest warrant failed, for whatever reason, to support that arrest. *United States v. Bailey,* 691 F.2d 1009, 1015–1018 (11th Cir.1982), *cert. denied,* 461 U.S. 933, 103 S.Ct. 2098, 77 L.Ed.2d 306 (1983); *United States v. Nooks,* 446 F.2d 1283, 1287–88 (5th Cir.), *cert. denied,* 404 U.S. 945, 92 S.Ct. 299, 30 L.Ed.2d 261 (1971). Therefore, since appellant's arrest was lawful, the officers' subsequent warrantless search of the Grand National's passenger area and glove compartment, and the container found therein, was likewise constitutionally permissible as a search incident to that arrest. *New York v. Belton, supra,* 453 U.S. at 460, 101 S.Ct. at 2864; *United States v. Diaz–Lizaraza, supra,* 981 F.2d at 1222; *Thomas v. Newsome,* 821 F.2d 1550, 1554 (11th Cir.), *cert. denied,* 484 U.S. 967, 108 S.Ct. 461, 98 L.Ed.2d 401 (1987); *see also United States v. Rollins,* 699 F.2d 530, 534 (11th Cir.) (extending *Belton* to passenger compartment of private airplane), *cert. denied,* 464 U.S. 933, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983). Accordingly, we conclude that the district court properly denied appellant's motion to suppress, in so far as that motion related to the .38 Smith & Wesson seized from the Grand National automobile.

### B.

■ Appellant next challenges the district court's denial of his motion to suppress evidence seized following the warrantless search of the Miami Lakes residence.[18] Since "'physical entry of the home is the chief evil

against which the wording of the Fourth Amendment is directed[,]' . . . [i]t is . . . 'a "basic principle of Fourth Amendment law[ ]" that searches and seizures inside a home without a warrant are presumptively unreasonable.'" *Welsh v. Wisconsin,* 466 U.S. 740, 748–49, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984) (citations omitted); *see also Illinois v. Rodriguez,* 497 U.S. 177, 181, 110 S.Ct. 2793, 2797–98, 111 L.Ed.2d 148 (1990); *Maryland v. Buie,* 494 U.S. 325, 331, 110 S.Ct. 1093, 1096, 108 L.Ed.2d 276 (1990); *Payton v. New York,* 445 U.S. 573, 590, 100 S.Ct. 1371, 1382, 63 L.Ed.2d 639 (1980); *United States v. Tobin,* 923 F.2d 1506, 1510 (11th Cir.) (en banc), *cert. denied,* 502 U.S. 907, 112 S.Ct. 299, 116 L.Ed.2d 243 (1991). However, as we have previously made clear in considering the propriety of the government's warrantless search of a private residence, "[i]t is 'well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search conducted pursuant to consent to search.'" *United States v. Freyre–Lazaro,* 3 F.3d 1496, 1500–01 (11th Cir.1993) (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043–44, 36 L.Ed.2d 854 (1973)), *cert. denied,* —— U.S. ——, 114 S.Ct. 1385, 128 L.Ed.2d 59 (1994). Moreover, there is no doubt that Maria Fernandez had the authority, as the owner of the Miami Lakes residence, to consent to the search of that property, *Government of Canal Zone v. Sierra,* 594 F.2d 60, 72 (5th Cir.1979), and, as there is no evidence to suggest that Maria ever relinquished her common authority over the room in which appellant had previously stayed, we have no doubt that she had authority to consent to the search of that area of her home. *United States v. Matlock,* 415 U.S. 164, 170, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974); *United States v. De Parias,* 805 F.2d 1447, 1458 (11th Cir.1986), *cert. denied,* 482 U.S. 916, 107 S.Ct. 3189, 96 L.Ed.2d 678 (1987). Ap-

---

18. In the court below, the government conceded that appellant had standing, as an overnight guest, to challenge the search of the Miami Lakes residence, see *Minnesota v. Olson,* 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990), despite the fact that it was not clear whether appellant had been an overnight guest on the evenings immediately prior to that search. However,

since the government declined to press this standing issue before the district court, we conclude that this issue has been waived. *United States v. Kapperman,* 764 F.2d 786, 791 n. 6 (11th Cir.1985); *see Steagald v. United States,* 451 U.S. 204, 209, 101 S.Ct. 1642, 1646, 68 L.Ed.2d 38 (1981).

pellant has no quarrel with this legal analysis. Rather, appellant argues that Maria's consent to search was not voluntarily given,[19] and since, as the government concedes, Maria's consent was the only proffered justification for the warrantless search of the Miami Lakes residence, the search of that residence was therefore unconstitutional, and hence all evidence obtained therefrom should have been suppressed. We disagree.

■■■ Whether an individual's consent to a warrantless search was given voluntarily is a question of fact that must be decided in light of the totality of the circumstances. *Schneckloth v. Bustamonte, supra,* 412 U.S. at 227, 93 S.Ct. at 2047. Further, " '[t]he government bears the burden of proving ... that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily.' " *United States v. Hidalgo,* 7 F.3d 1566, 1571 (11th Cir.1993) (quoting *United States v. Blake,* 888 F.2d 795, 798 (11th Cir.1989)); *see also Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1323, 75 L.Ed.2d 229 (1983). As the district court's voluntariness determination is a factual one that usually turns on " 'credibility choices resulting from conflicting testimony,' " *United States v. Freyre–Lazaro, supra,* 3 F.3d at 1501 (citation omitted), we will not disturb her judgment unless

it is shown to be clearly erroneous. *Id.; see also United States v. Hidalgo, supra,* 7 F.3d at 1571; *United States v. Blake, supra,* 888 F.2d at 798; *United States v. Massell,* 823 F.2d 1503, 1507 (11th Cir.1987). And while we have enumerated a number of (non-exclusive) factors that may bear on the issue of voluntariness, see, *e.g., United States v. Blake, supra,* 888 F.2d at 798–99, the absence of official coercion is a *sine qua non* of effective consent, as it is axiomatic that "[w]here there is coercion, there cannot be consent." *Bumper v. North Carolina,* 391 U.S. 543, 550, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968); *see also Florida v. Bostick,* 501 U.S. 429, 438, 111 S.Ct. 2382, 2388, 115 L.Ed.2d 389 (1991) (" 'Consent' that is the product of official intimidation ... is not consent at all."). In passing upon this question, we are constrained to consider only the totality of the circumstances as they existed from the time when Maria Fernandez arrived at the Miami Lakes property, since it was she, and she alone, who provided the consent to search.[20]

The record indicates that when Maria arrived at the Miami Lakes residence, she was approached by Supervisory Marshal Conboy, who requested that she consent to a search of her home. The substance of that request

19. By conceding appellant's standing to contest the search of the Miami Lakes residence, see note 18 *supra,* it would appear that the government has also conceded appellant's standing to challenge the voluntariness of the alleged consent to that search, irrespective of the fact that such consent was provided by a third party. *See United States v. Matlock, supra,* 415 U.S. at 188, 94 S.Ct. at 1001 (Brennan, J., dissenting) (right to contest a third-party's consent to search necessarily entails the right to challenge the voluntariness of that consent); *cf. United States v. Freyre–Lazaro, supra,* 3 F.3d at 1500–01 (allowing a defendant to contest the voluntariness of his wife's consent to search, assuming that he had standing to do so). In any event, while the government contested appellant's standing to challenge Maria's consent in the district court (an issue which the lower court did not pass upon), it has not raised this issue in this Court, either in its brief or at oral argument. Accordingly, we decline to address the merits of this standing question. *See* Fed.R.App.P. 28(a)(5); *United States v. Kapperman, supra,* 764 F.2d at 791 n. 6; *see generally Cheffer v. Reno,* 55 F.3d 1517, 1519 n. 1 (11th Cir.1995) (issues not briefed are deemed abandoned).

20. We do not, however, wish to minimize the impropriety of the conduct which the officers directed towards Raquel prior to Maria's arrival at the scene. For example, it appears that Raquel was unlawfully seized when Deputy Marshal Figmik stopped her automobile without any suspicion of wrongdoing on her part, see *Delaware v. Prouse, supra,* and thereafter refused to allow her to leave the scene. See *Florida v. Royer, supra.* Further, it appears that Deputy Marshal Figmik's conduct in twice opening the residence's garage door without consent (and without a search warrant) was also unlawful. *See Arizona v. Hicks,* 480 U.S. 321, 324–25, 107 S.Ct. 1149, 1152–53, 94 L.Ed.2d 347 (1987). Although such conduct cannot be justified, those actions can not be viewed as affecting the voluntariness of Maria's consent, since those acts took place prior to her arrival, and there is no indication that Maria was ever apprised of those events or threatened with similar conduct before she gave her consent to search. We nevertheless feel it important to express our concerns about those incidents.

was then repeated in "street Spanish" by Deputy Marshal McDermott. Following a conversation with her daughter, Maria Fernandez stated that she wanted to go inside her house and get a drink of water. Deputy Marshal McDermott then "told" Maria, in Spanish, that "he wanted to go in" the house with her, and when she "didn't bar [him] from going in," he followed her inside. Once inside, Deputy Marshal McDermott continued to solicit Maria's consent, explaining that the officers wanted to search for items belonging to appellant. In addition, he informed Maria of her "right" to refuse such consent. According to Deputy Marshal McDermott, Maria finally gave her oral consent to the search, and Maria and Deputy Marshal McDermott then returned outside. A short while later, Maria signed a written consent form, after the substance of that form—including her right to refuse consent—had been explained to her in Spanish.

After reviewing the record, as we must, in the light most favorable to the government, we conclude that the district court's factual determination that Maria voluntarily consented to the search of her property was not clearly erroneous. In reaching its conclusion, the district court placed great weight on the fact that Maria (as opposed to her daughter) was never placed under any unlawful restraints, and that she agreed to the search and signed the consent-to-search form after being told of her legal right to withhold her consent, and after being assured that her daughter was not in any jeopardy. These findings are adequately supported by the evidence. The district court's supplemental finding that "there [was] no evidence of police coercion" presents a much closer and more difficult question, but, again, we conclude that this finding was not clearly erroneous.

■ According to Deputy Marshal McDermott's testimony, he admitted following Maria into her home before he obtained her consent to search (or to enter) the premises. Upon entering Maria's home, there is little doubt that Deputy Marshal McDermott effected a warrantless entry (and search), albeit a limited one, of the kitchen area of Maria's home,[21] *see Johnson v. United States,* 333 U.S. 10, 13, 68 S.Ct. 367, 368, 92 L.Ed. 436 (1948) (entry into a defendant's living quarters characterized as "the beginning of the search"); *see also Arizona v. Hicks, supra,* 480 U.S. at 324–25, 107 S.Ct. at 1152–53 (a search occurs whenever something not previously in plain view becomes exposed to an investigating officer), and, as discussed previously in this opinion, a warrantless entry (and consequent search) of a person's home is presumptively unconstitutional, absent some exigent circumstance (none of which is even arguably present in this case) or effective consent. We reject the government's argument that Maria's failure to "bar" Deputy Marshal McDermott's follow-on entry when she went into her house to get a drink of water can be viewed as an adequate implied consent to that warrantless intrusion. *See* 3 Wayne R. LaFave, *Search and Seizure—A Treatise on the Fourth Amendment* § 8.2(a) at 180 (1987) (when the police state that they "want to" undertake some activity, agreement to such an imperative statement is often seen as submission to a claim of authority) (hereinafter "LaFave").

■ "[F]or consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." *United States v. Garcia,* 890 F.2d 355, 360 (11th Cir.1989). Thus, "[c]onsent in any meaningful sense cannot be said to exist merely because a person (a) knows that an official intrusion into [her] privacy is contemplated if [she] does a certain thing, and then (b) proceeds to do that thing." 3 LaFave, *supra,* § 8.2(1) at 220 (internal quotes and footnote omitted). In recognition of this fact, we believe, "[a]s a matter of law, it cannot be said that failure to object to a search equals

---

**21.** Even though no "fruits" were obtained from that entry, this in no way impacts upon the Fourth Amendment violation that accompanied Deputy Marshal McDermott's warrantless entry. As the Supreme Court has explained, "the reason why an officer might enter a house ... is wholly irrelevant to the threshold question whether the Fourth Amendment applies.... [The Fourth Amendment] would be no less transgressed if the [entry into] the house was undertaken to collect evidence ... or on a whim, for no reason at all." *Soldal v. Cook County,* 506 U.S. 56, 69, 113 S.Ct. 538, 548, 121 L.Ed.2d 450 (1992).

consent to the search." *United States v. McBean,* 697 F.Supp. 495, 502 (S.D.Ga.1987), *rev'd on other grounds,* 861 F.2d 1570 (11th Cir.1988); *but cf. United States v. Deutsch,* 987 F.2d 878, 883 (2d Cir.1993). We have previously noted our hesitancy to find implied consent (*i.e.,* consent by silence) in the Fourth Amendment context, *see United States v. Berry,* 670 F.2d 583, 596 (5th Cir. Unit B 1982) (en banc),[22] and we agree with our colleagues in the Ninth Circuit that, whatever relevance the implied consent doctrine may have in other contexts, it is inappropriate to "sanction[ ] entry into the home based upon inferred consent." *United States v. Shaibu,* 920 F.2d 1423, 1426 (9th Cir.1990). As Judge Ferguson cogently explained:

> [T]he government may not show consent to enter from the defendant's failure to object to the entry. To do so would be to justify entry by consent and consent by entry. 'This will not do.' *Johnson v. United States,* 333 U.S. at 17 [68 S.Ct. at 370]. We must not shift the burden from the government—to show 'unequivocal and specific' consent—to the defendant, who would have to prove unequivocal and specific objection to a police entry, or be found to have given implied consent.

*Id.* at 1427–28; *cf. United States v. Edmondson,* 791 F.2d 1512, 1515 (11th Cir. 1986) (no implied consent to enter defendant's dwelling to effect an arrest when defendant opened his door upon being told to do so by the arresting officer).

■ But, should this illegal entry, as a matter of law, be deemed to be coercive police activity necessarily affecting Maria's later consent to search the portion of the premises previously occupied by appellant? We think not. Rather, it is only one circumstance—albeit an important circumstance—which the fact-finder must consider along with all the other relevant facts in determining the voluntariness of the consent. Indeed, probably the most important of the relevant circumstances in this case is found in the fact

that Maria did *not* testify that Deputy Marshal McDermott's illegal entry had any coercive effect upon her. Rather, as that portion of the district court's opinion quoted below makes clear, Maria's claim was that she was coerced by the officers' alleged threats to imprison her daughter if she declined to consent to the search.

As pointed out by the government, the district court was confronted by two "wildly differing accounts" of the events leading up to the search of the bedroom where appellant had stayed while in Maria's house. The government called two witnesses during the suppression hearing, Deputy Marshal Figmik and Deputy Marshal McDermott. Appellant called Maria Fernandez.[23] Maria's daughter, Raquel, did not testify. After the hearing Judge Nesbett ruled from the bench. It is important to note a portion of her findings and her analysis of the house-search issue:

> The motion to suppress the evidence recovered from the Fernandez house takes more consideration. The defendants move to suppress all the evidence because the search was not justified by either the warrant or exigent circumstances, and that the mother's consent, Mrs. Fernandez, was obtained through coercion or duress.
>
> . . . .
>
> However, the question is whether the consent of the mother was procured through the fact that the daughter was being detained. And, therefore, the mother felt that threats were being either levelled against her daughter or that she was being coerced because of her daughter's situation.
>
> We do have a consent in this case and the question is whether the consent was voluntary. In evaluating whether a consent is voluntary, the Eleventh Circuit [has] said that the court must take into consideration several factors: the defendant's custodial status. Here, the mother was free to leave. As a matter of fact, she

---

**22.** In *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33, 34 (11th Cir.1982), we adopted as binding precedent all decisions of the prior Fifth Circuit Unit B decided after September 30, 1981.

**23.** In addition, appellant called an expert transportation consulting engineer, Myles Elliott Moss, to testify about the dynamics of the crash of the two automobiles which, in turn, arguably had a bearing on the credibility of the officers' testimony. See note 4 *supra.*

left the scene after being [made] aware of what the agents wanted to do and went to a pay phone and made a call or attempted to make a call and then came back.

There's a question, there is an issue of whether there was the presence of coercive police procedure. I also must consider the extent of defendant's cooperation or awareness of a [right to] refuse to consent, whether she could refuse to consent, her education and intelligence and her belief that no incriminating evidence would be found.

Now, assuming that the daughter was— that the stop of the daughter was illegal, and the marshals testified to that, then the court, I have to consider the amount of time between the daughter being detained and the intervening circumstances which might dissipate the effect of that detention and subsequent consent by the mother as a result of the daughter perhaps being, the daughter being in police custody, any type of flagrancy or outlandishness of any police conduct that was testified to.

Now, taking these factors into consideration, I found the testimony of the marshal's testimony [sic]—evidence was credible, and I found the mother's testimony in many ways not as credible or lacking in credibility.

Now, applying these standards, Eleventh Circuit standards to the mother's consent, I find that her consent was voluntary and not due to coercion.

First, the mother, who actually gave consent, was not in police custody, herself. She went into her own house, she was free to leave, she did leave the house, she went away in her car and came back. So the first prong is lacking. There is no custody and immediate requesting of consent.

There is no evidence of police coercion. The evidence through the officers indicate[s] that the marshals informed both the daughter and mother that the house could [not] be searched without their consent and they had a right to refuse to consent.

And according to McDermott's testimony, the mother agreed to cooperate to the search when she learned that the defendant[,] and not the daughter[,] was going to be the subject of the search. Once she realized that it was only Augustin Gonzalez' possessions that the officer wanted, she agreed to the search.

The mother signed a consent form. She testified she didn't understand it. The officers, who I find credible, said that she was, that the substantive matters of the consent form were explained to her and she acquiesced and understood that she was consenting to a search of Augustin Gonzalez' room.

The evidence indicates the mother believed that only the defendant had done anything wrong, and not her family, and this, combined with the statements of the officers and assurances that they were only going to obtain items of the defendant, further support the finding that she voluntarily and purposely consented to the search.

So the mother's voluntary consent was not the product of her daughter's illegal, admittedly illegal arrest because of the significant time period between the time the daughter was arrested and the time the mother gave her consent.

There were many intervening circumstances that would minimize the role of the daughter's arrest and the mother's consent.

. . . .

The daughter was permitted to call her mother. The mother came from a place somewhere away from the house, drove to the house, and as I've said before, left again and came back and then gave her consent.

The consent form was in English, not in Spanish, but there was testimony that it was explained to her and that she understood the consent.

[The] [m]ost important thing is that the mother was never placed under an unlawful arrest and/or arrest of any type. She was—the only one that was detained at all and could be considered arrested was the daughter. And there was such a great amount of time between that period of time and when the consent was [e]ffected

that I find that the consent was voluntarily given. And so, therefore, the evidence obtained from the house will not be suppressed.

The district court found the officers' testimony to be credible, but found Maria's testimony to be "lacking in credibility." The court emphasized the "amount of time" between the detention of Raquel and the subsequent consent of her mother to the search. And, the court also emphasized that Maria held off consenting until she had satisfied herself that appellant, and not Raquel, was the target of the search. We conclude that these findings, and the ultimate finding that Maria voluntarily consented to the search, are adequately supported by the evidence and are not clearly erroneous.

### III.

■ Appellant next argues that his convictions under 18 U.S.C. § 922(a)(6) (making false statements in connection with the purchase of a firearm) should be reversed because the district court's instruction concerning a stipulation as to the admissibility of the BATF 4473 forms had the effect of requiring the jury to conclude that appellant had made a false statement on those forms, and had hence violated § 922(a)(6). Since appellant adequately objected to the district court's instruction below, this issue has been properly preserved for appeal. See Fed.R.Crim.P. 30. We must therefore determine whether the district court's instruction had the effect of impermissibly directing the jury to return a guilty verdict, and hence effected a violation of appellant's due process rights. United States v. Perez–Tosta, 36 F.3d 1552, 1564 (11th Cir.1994), cert. denied, —— U.S. ——, 115 S.Ct. 2584, 132 L.Ed.2d 833 (1995); United States v. Turner, 871 F.2d 1574, 1578 (11th Cir.), cert. denied, 493 U.S. 997, 110 S.Ct. 552, 107 L.Ed.2d 548 (1989). We perceive no such error in the district court's instruction.

■ In order to prove a violation of § 922(a)(6), the government was required to show that appellant knowingly "made a false statement material to the lawfulness of the sale of firearms." United States v. Hawkins, 794 F.2d 589, 590–91 (11th Cir.1986). To meet this burden, the government sought to introduce into evidence the two BATF 4473 forms which contained false statements (the various "no" responses discussed above, see Fed.R.Evid. 801(a)(1); Fioretti v. Massachusetts General Life Ins. Co., 53 F.3d 1228, 1232 n. 14 (11th Cir.1995)), which it claimed were made by appellant when purchasing the two firearms at issue in this case. However, since the jury was being asked to accept the "truth" of the statements in the two BATF 4473 forms (namely that those statements were factually false), the statements in those documents were undoubtably hearsay, Fed.R.Evid. 801(c); Fioretti v. Massachusetts General Life Ins. Co., supra, 53 F.3d at 1232 n. 14, and hence inadmissible unless they fell within some recognized exception to the hearsay exclusionary rule. Fed.R.Evid. 802. The government therefore sought to introduce those documents under the "business record" exception to the hearsay rule, see Fed.R.Evid. 803(6), and the district court properly recognized that the BATF 4473 forms could properly qualify for admission under this hearsay exception, provided that the government could show that the forms were maintained in the ordinary course of business. United States v. Veytia–Bravo, 603 F.2d 1187, 1189–1192 (5th Cir.1979), cert. denied, 444 U.S. 1024, 100 S.Ct. 686, 62 L.Ed.2d 658 (1980). Instead of having the gun retailer offer live testimony that the BATF 4473 forms were, in fact, kept in the ordinary course of business, the government sought to prove this fact by a stipulation agreed to by appellant. Immediately prior to that stipulation being read to the jury, the district court gave the jury the following instruction as to the legal effect of the stipulation:

> [M]embers of the jury, a stipulation is an agreement that certain evidence may be presented to you by way of the stipulation and obviates the necessity of witnesses being called to testify as to these facts or documents being introduced to testify as to the facts of the stipulation.

Following this instruction, the government presented the jury with the following stipulation:

The United States of America, defendant Augustin Gonzalez and his defense counsel do hereby stipulate and agree to the following:

Exhibit 17 and 18, [B]ATF Forms 4473, are documents kept by Collazo Guns and Ammo in the regular course of business, and, therefore, may be admitted without objection on hearsay grounds.

 Appellant contends that the district court's instruction was phrased such that the jury was required to conclude that appellant had, in fact, answered "no" to the various questions posed on the BATF forms, which answers, as previously discussed, were false and hence violative of § 922(a)(6). Of course, appellant is correct when he observes that since he did not agree to stipulate to the "truth" of the statements in the BATF 4473 forms (*i.e.*, that he had actually made those false statements), it would have been error for the district court to instruct the jury that it was required to accept the truth of the government's factual contention that appellant had, in fact, made those false statements, since such an instruction would have relieved the government from its burden of proving a violation of § 922(a)(6). *See United States v. Hellman*, 560 F.2d 1235, 1236 (5th Cir.1977). However, as is patently clear from the district court's instruction, the jury was never told that it was required to accept the government's contention that appellant had, in fact, made the false statements, only that it was entitled to consider the BATF 4473 forms as evidence of that fact. Appellant remained free to argue that the "no" responses were completed by the retailer after he had signed the BATF 4473 forms in blank and had left the shop. Indeed, a similar argument was presented to the jury by defense counsel. The jury, however, rejected that argument and concluded that it was appellant who had provided the false information contained in the BATF 4473 forms, and it was plainly within its province to do so.[24] *See generally United States v. Bell*, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc), *aff'd on other grounds*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). Thus, even accepting appellant's argument that he had not actually written "no" on the BATF 4473 forms, the evidence was nevertheless sufficient to sustain his convictions under § 922(a)(6), since appellant's signature on the BATF 4473 forms constituted a representation by him that the responses on the forms were true, even if those responses were actually filled in by someone else. *United States v. Heath*, 536 F.2d 1069, 1070 (5th Cir.1976). We further point out that appellant's signing the BATF 4473 forms under a false name was itself a misrepresentation ordinarily sufficient to sustain a conviction under § 922(a)(6). *United States v. Taylor*, 489 F.2d 284 (5th Cir.1973), *cert. denied*, 417 U.S. 948, 94 S.Ct. 3074, 41 L.Ed.2d 668 (1974).

IV.

 Appellant next argues that the evidence presented at trial was insufficient, as a matter of law, to sustain his conviction under Count IV of the indictment (illegal possession of the .38 Smith & Wesson). Appellant contends that since it was undisputed that he did not own the Buick Grand National, the government was required to produce sufficient evidence to prove, beyond a reasonable doubt, that he knew the .38 Smith & Wesson was in the automobile's glove compartment in order to prove that he possessed that weapon within the meaning of 18 U.S.C. § 922(g)(1). Whether the evidence was sufficient to sustain appellant's conviction is a

**24.** There is one wrinkle in this analysis that should be addressed. As appellant correctly points out, while the government presented evidence to show that he actually signed the BATF 4473 forms (albeit under a false name), it failed to offer any evidence to prove that appellant (as opposed to the retailer) had actually written the various "no" responses on the forms. Thus, appellant argues that it was impossible for the jury to determine whether it was appellant who had written those answers, or whether the gun retailer wrote those answers after appellant answered the questions orally. Even assuming the latter, the statements in the BATF 4473 forms were properly admitted. Under these assumed facts, the retailer's written statements in the BATF 4473 forms would merely be recordings of appellant's oral statements. However, since appellant's oral statements would not meet the definition of hearsay, see Fed.R.Evid. 801(d)(2)(A), the retailer's written statements would continue to constitute ordinary hearsay (as opposed to double hearsay), and thus would have continued to be admissible under Fed.R.Evid. 803(6).

question of law we review *de novo.* *United States v. Waymer,* 55 F.3d 564, 570 (11th Cir.1995); *United States v. Morris,* 20 F.3d 1111, 1114 (11th Cir.1994). In passing on this argument, we must view the evidence in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Starrett,* 55 F.3d 1525, 1541 (11th Cir.1995), and we are required to affirm appellant's conviction unless, under no reasonable construction of the evidence, could the jury have found appellant guilt beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Camargo–Vergara,* 57 F.3d 993, 997 (11th Cir.1995).

▮ By its terms, § 922(g)(1) makes it a crime for a convicted felon to "possess" any firearm that in any way affects interstate commerce.[25] Possession, in the context of § 922(g)(1), requires that the defendant knowingly possess the firearm, *United States v. Billue,* 994 F.2d 1562, 1565 n. 2 (11th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 939, 127 L.Ed.2d 230 (1994), and may be proven either by showing that the defendant actually possessed the firearm, or by showing that he constructively possessed the firearm. *United States v. Pedro,* 999 F.2d 497, 500 (11th Cir.1993); *United States v. Winchester,* 916 F.2d 601, 605 (11th Cir. 1990). In the present case, since the .38 Smith & Wesson was not found on appellant's person, the government relied (as it was required to) upon a theory of constructive possession to sustain appellant's conviction under § 922(g)(1). As we have previously explained in the context of a challenge to a conviction under § 922(g)(1):

> [F]or a person to have constructive possession over a firearm, the person must have both "the intent and the power to exercise dominion and control over the [firearm]." [*United States v. Smith,* 591 F.2d 1105, 1107 (5th Cir.1979).] As such, a defendant must, in fact, know of the firearm's existence in order to exercise dominion and

control over it. See also *United States v. Mieres–Borges,* 919 F.2d 652, 657 (11th Cir.1990), *cert. denied,* [499] U.S. [980], 111 S.Ct. 1633, 113 L.Ed.2d 728 (1991) (noting constructive possession requires "knowing exercise" or "knowing power or right to exercise dominion and control"). Moreover, a defendant's " 'mere presence in the area of [an object] or awareness of its location is not sufficient to establish possession.' " *Id.* (quoting *United States v. Maspero,* 496 F.2d 1354, 1359 (5th Cir. 1974)).

*United States v. Pedro, supra,* 999 F.2d at 500–01.

Of course, at trial the government presented evidence of appellant's ownership of the .38 Smith & Wesson—namely the receipt and BATF 4473 form filled out by appellant in connection with the purchase of that firearm—to establish that appellant knew that the .38 Smith & Wesson was in the Grand National automobile, and that he could therefore properly be viewed as having constructive possession over that weapon. Indeed, the record reflects that the government relied heavily upon those documents in order to prove appellant's possession of the .38 Smith & Wesson, both in arguing against appellant's motion for a judgment of acquittal with respect to this count, as well as in its closing argument to the jury. It is clear that the information contained in those two documents is, alone, sufficient to establish that appellant knowingly possessed the .38 Smith & Wesson. *See United States v. Billue, supra,* 994 F.2d at 1565; *United States v. Clavis,* 956 F.2d 1079, 1095 (11th Cir.), *cert. denied,* 504 U.S. 990, 112 S.Ct. 2979, 119 L.Ed.2d 597 (1992); *United States v. Laroche,* 723 F.2d 1541 (11th Cir.1984), *cert. denied,* 467 U.S. 1245, 104 S.Ct. 3521, 82 L.Ed.2d 829 (1984).

Furthermore, although the evidence produced at trial indicated that the Buick Grand National driven by appellant at the time of his arrest was, in fact, registered to a third person (Ana E. Don),[26] and although the

---

**25.** At trial, appellant did not dispute that he was a convicted felon, or that the .38 Smith & Wesson had previously travelled in interstate commerce.

**26.** The record does not indicate the relationship between that third person and appellant.

government failed to offer any evidence at trial suggesting that appellant had previously been seen driving the Grand National, or that he had previously been seen in possession of a firearm,[27] there was, nevertheless, additional evidence from which the jury could reasonably have found that appellant knowingly possessed the .38 Smith & Wesson. Appellant's presence in the Grand National, with ready access to the weapon later discovered in the glove compartment, was sufficient to prove that he possessed the .38 Smith & Wesson, irrespective of the fact that the Grand National belonged to a third person.[28] *See United States v. Gates,* 967 F.2d 497, 499 (11th Cir.) (passenger held to have had constructive possession over weapons located under the driver's seat), *cert. denied,* 506 U.S. 1011, 113 S.Ct. 632, 121 L.Ed.2d 563 (1992);[29] *cf. United States v. Machado,* 804 F.2d 1537, 1547 (11th Cir.1986) (similar holding under Florida law); *contra United States v. Chairez,* 33 F.3d 823, 825 (7th Cir.1994); *United States v. Wright, supra,* 24 F.3d at 735; *United States v. Soto, supra,* 779 F.2d at 560. We therefore conclude, with respect to appellant's conviction under Count IV of the indictment, that the evidence was sufficient to sustain appellant's conviction under that count.

**V.**

■ Appellant next argues that the district court erred in limiting his cross-examination of a government witness (Deputy Marshal Figmik), and in precluding him from offering testimony of an expert witness (an accident reconstruction expert). We review the district court's rulings on these evidentiary matters for an abuse of discretion. *United States v. Grizzle,* 933 F.2d 943, 949 (11th Cir.) (admission of expert testimony), *cert. denied,* 502 U.S. 897, 112 S.Ct. 271, 116 L.Ed.2d 223 (1991); *United States v. Cohen,* 888 F.2d 770, 775 (11th Cir.1989) (cross-examination of witnesses). We find no merit in either of these arguments, and conclude that the district judge acted well within her discretion in each instance complained of by appellant.

■ In arguing that the district judge abused her discretion in limiting his cross-examination of Deputy Marshal Figmik, appellant claims that he should have been permitted to ask Deputy Marshal Figmik about an internal affairs investigation that was conducted in connection with appellant's arrest. Appellant argues that this line of inquiry would have been relevant in establishing Deputy Marshal Figmik's bias against appellant. Of course, while it is clear that "inves-

---

**27.** During the suppression hearing, Deputy Marshal Figmik testified that, prior to appellant's arrest, various confidential informants had informed him that appellant had been seen driving the Grand National and that appellant had previously been seen in possession of a firearm. Had the government offered these informants' testimony at trial, these two facts possibly would have been sufficient to establish appellant's constructive possession of the .38 Smith & Wesson at the time of his arrest. *See United States v. Strollar,* 10 F.3d 1574, 1576–77 (11th Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 2688, 129 L.Ed.2d 820 (1994); *United States v. Travis,* 993 F.2d 1316, 1321 (8th Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 229, 126 L.Ed.2d 184 (1993). The government, however, declined to offer any such testimony at trial.

**28.** Given this conclusion, we need not decide whether appellant's act of lunging toward the glove compartment would be sufficient to establish his possession of the .38 Smith & Wesson. *Compare United States v. Wright,* 24 F.3d 732, 735 (5th Cir.1994) (such evidence insufficient to establish possession); *United States v. Blue,* 957 F.2d 106, 108 (4th Cir.1983) (same) *with United*

*States v. Lyles,* 946 F.2d 78, 81 (8th Cir.1991) (such evidence sufficient to establish possession); *United States v. Coe,* 718 F.2d 830 (7th Cir.1983) (same).

**29.** It appears that the panel in *Gates* equated a person's access to a weapon with his knowledge of the weapon's existence and his ability to exercise control thereover, despite the fact that accessibility alone is not usually thought to be sufficient to establish knowing dominion or control. *E.g., United States v. Soto,* 779 F.2d 558, 560 (9th Cir.1986), *cert. denied,* 484 U.S. 833, 108 S.Ct. 110, 98 L.Ed.2d 70 (1987). Indeed, it is difficult to reconcile the holding in *Gates* with our statement in *United States v. Pedro* that one's " *'mere presence in the area of [an object] or awareness of its location* is not sufficient to establish possession.' " 999 F.2d at 501 (emphasis added) (citation omitted). Nevertheless, despite this tension in our decisions, we are not free to overrule or otherwise disregard a decision of a prior panel of this Court. *United States v. Hogan,* 986 F.2d 1364, 1369 (11th Cir.1993). Accordingly, we follow the *Gates* rationale, as the facts in *Gates* more closely mirror those of the present case than the facts in *Pedro.*

tigation of a witness' credibility through the exposure of his or her bias and motivation" is a right guaranteed by the Sixth Amendment's Confrontation Clause,[30] *United States v. Sheffield,* 992 F.2d 1164, 1168 (11th Cir. 1993); *see also Davis v. Alaska,* 415 U.S. 308, 316–17, 94 S.Ct. 1105, 1110–11, 39 L.Ed.2d 347 (1974), it is equally clear that the district court may curtail the scope of such cross-examination when appropriate. *See United States v. Cohen, supra,* 888 F.2d at 775. In the present case, there was simply no evidence presented to the district court to suggest that the internal affairs investigation had any negative impact upon Deputy Marshal Figmik. Rather, it appears this investigation ultimately cleared Deputy Marshal Figmik of any wrongdoing, thereby negating the suggested motive for bias against appellant. Further, Deputy Marshal Figmik testified, out of the presence of the jury, that he was never told who had filed the complaint that triggered the investigation, a fact which further undercuts any claim of bias. Moreover, we note that the jury was ultimately made aware of that investigation during the testimony of another government witness (Special Agent Adam Price), and that Deputy Marshal Figmik was subjected to vigorous cross-examination designed to uncover any bias or prejudice that he may have harbored against appellant. In short, we perceive no abuse of discretion in the district court's decision to foreclose appellant from inquiring about the internal affairs investigation of Deputy Marshal Figmik. *See United States v. Calle,* 822 F.2d 1016, 1020 (11th Cir.1987) (limited cross-examination appropriate where the jury is exposed to sufficient information tending to show a witness' alleged bias) (citing cases).

■ We also find no error in the district court's decision to preclude appellant from offering the testimony of his accident reconstruction expert. This expert testimony was proffered to bolster appellant's claim, presented during his cross-examination of Depu-

ty Marshal Figmik and Special Agent Mastin, that the pursuing officers rammed into the Grand National in order to end their chase with appellant. Thus, it is evident that appellant was hoping to use this testimony to discredit Deputy Marshal Figmik's and Special Agent Mastin's testimony concerning the details of their chase of appellant. This is precisely the sort of distracting "trial within a trial" that Fed.R.Evid. 608(b) seeks to avoid, as extrinsic evidence is ordinarily not admissible for the sole purpose of impeaching a witness' credibility. *See United States v. Schardar,* 850 F.2d 1457, 1462 (11th Cir.), *cert. denied,* 488 U.S. 932, 109 S.Ct. 326, 102 L.Ed.2d 343 (1988). Rather, such extrinsic evidence is admissible under Rule 608(b) only when it tends to " 'contradict[ ] the *material* testimony of a prior witness,' " *United States v. Calle, supra,* 822 F.2d at 1021 (quoting *United States v. Russell,* 717 F.2d 518, 520 (11th Cir.1983)), and the question whether appellant rammed the officers' car, or *vice versa,* was simply not adequately material to the crimes for which appellant stood charged at trial.[31]

### VI.

■ Finally, appellant argues that the district court erred in subjecting him, under U.S.S.G. § 3C1.2, to a two-point sentencing enhancement for reckless endangerment during flight. We review the district court's factual findings at sentencing under the clearly erroneous standard, 18 U.S.C. § 3742(e); *United States v. Hansley,* 54 F.3d 709, 714 (11th Cir.1995), keeping in mind that the government's burden of proof is the preponderance of the evidence standard. *United States v. Jackson,* 57 F.3d 1012, 1019 (11th Cir.1995). Of course, we review the district court's application of the sentencing guidelines *de novo. United States v. Delgado,* 56 F.3d 1357, 1363 (11th Cir.1995).

We find no error in the district court's decision to impose a two-point enhancement under § 3C1.2. In imposing this enhancement, the district court relied heavily upon

---

**30.** "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." U.S. Const. amend. VI.

**31.** While this issue would undoubtedly have been material to the charge of assaulting a federal officer with which appellant was charged in the indictment, the government dismissed that charge prior to trial. See note 4 *supra.*

the fact that, in attempting to escape from the arresting officers, appellant operated his vehicle, in reverse, at a high rate of speed on a residential street. Section 3C1.2 allows for a sentencing enhancement whenever "the defendant recklessly created a substantial risk of death or seriously bodily injury to another person in the course of fleeing from a law enforcement officer," which guideline encompasses a defendant's efforts to avoid arrest. U.S.S.G. § 3C1.2 appl. note 3. The district court found, as a matter of fact, that appellant's conduct exhibited a reckless disregard for the safety of the various persons who resided on that street, as well as for the safety of those who might otherwise be present on that street (notably, a pre-school was located near the scene of this chase), and we cannot conclude that the district court's factual finding was clearly erroneous. *See United States v. Jones,* 32 F.3d 1512, 1520 (11th Cir.1994) (high speed chase on a highway justified § 3C1.2 enhancement); *accord United States v. Woody,* 55 F.3d 1257, 1274 (7th Cir.1995) (same), *cert. denied,* — U.S. —, 116 S.Ct. 234, 133 L.Ed.2d 163 (1995). Given this factual finding, the district court's imposition of a two-point enhancement under § 3C1.2 was plainly correct.

AFFIRMED.